## ALOIS ET UX. *v.* WALDMAN ET UX.

[No. 153, September Term, 1958.]

*Decided March 19, 1959.*

The cause was argued before HENDERSON, HAMMOND and PRESCOTT, JJ.

*Jerome M. Asch* and *Clayton C. Carter,* for appellants.

*Howard Wood,* with whom was *Vachel A. Downes, Jr.,* on the brief, for appellees.

HENDERSON, J., delivered the opinion of the Court.

The appellants sued the appellees at law to recover a deposit of $3,500 paid under a written agreement to purchase a residence upon a tract of land containing about 9½ acres, on Kent Island, alleging breach of condition by David M. Nichols & Company, the real estate broker, to procure a mortgage for part of the purchase price within the time specified in the agreement. The owners defended on the ground that the failure to procure the mortgage was due to the actions of the buyers and their failure to cooperate with the broker. The owners also filed a counterclaim for damages incurred in reliance upon the buyers' agreement to purchase. They also filed a third-party claim against the broker for reimbursement, in the event they were required to return the deposit. The broker filed a plea alleging that, by agreement between them, he paid one-half of the deposit to the owners, and hence would be liable to the owners for only $1,750 in any event. The case was tried before the court without a jury, and resulted in a judgment in favor of the appellees in the main action, a judgment for the appellees in the sum of $1,392.88 on the counterclaim, and dismissal of the third-party claim.

The contract in question, dated June 1, 1957, fixed the purchase price at $35,000, of which $3,500 was to be a down payment, the balance to be paid at final settlement on August 1, 1957. Of this balance, $21,000 was to be "in cash at time of settlement by way of a purchase money mortgage to be procured for the buyers by David M. Nichols & Company. Said mortgage to be in the amount of $21,000 on a 12 year direct reduction Building and Loan mortgage, with interest not to exceed 5% per annum and with principal and interest payments not to exceed $195 per month plus 1/12 of annual taxes and fire insurance. The buyers, by execution of this contract, expressly agree to execute such mortgage. In the event that David M. Nichols & Company is unable to obtain the aforementioned purchase money mortgage for the buyers on or before July 3, 1957, then this contract shall be null and void and the aforementioned $3,500 deposit shall be returned to the buyers. Settlement to occur on or before August 1, 1957." The contract further provided that time was of the

essence, and that the sellers would pay "a commission on this sale" in the amount of $3,500 to the broker.

While there is some dispute in the testimony, we accept the findings of fact made by the trial court. "At the time the contract was signed, the salesman for the broker advised Col. and Mrs. Alois in respect to the mortgage loan to go home and wait until they were called by the broker and that the broker would attend to the matter. About June 6th or 7th, the broker obtained what he considered a verbal commitment from officials of the Monumental Life Insurance Company in Baltimore to accept the purchase money mortgage described in the contract and shortly thereafter referred the buyers to the company. Accordingly, Col. Alois visited the offices of [Monumental] on June 13th, and was advised that because of his limited independent resources, the company would not accept a mortgage for more than $18,000 and on a 15-year repayment basis. He was then given an application for the loan under these terms and instructed to find an additional $3,000 and then resubmit the application. Col. Alois was not instructed by Monumental to advise the broker of the result of their conference and did not do so. * * *

"On June 19th the sales manager for the broker communicated with Monumental and learned the result of their conference with Col. Alois. On June 25th Mr. Abell, a salesman for the broker, telephoned the Alois home and was informed by Mrs. Alois that her husband was in New York attempting to procure the mortgage loan. Mr. Abell then informed her his company was in a position to procure the mortgage, but in order to do so it was necessary that he personally contact Col. Alois. Mr. Abell again telephoned the Alois home, on June 27th and 29th, in an effort to contact Col. Alois and was given the same information by Mrs. Alois. * * * Col. Alois returned to his home in the late evening of Saturday, June 29th; remained at home Sunday, the 30th, and left home again on Monday, July 1st. Mr. Abell * * * again called the Alois home on June 30th and talked to Mrs. Alois who again informed him her husband was not at home. Col. Alois testified that he was informed by his wife of the telephone calls from the broker made between the 25th and the

29th but disclaimed any knowledge of the telephone call on Sunday, June 30th. He explains that he did not call back on June 30th because he had been informed by Nichols 'to fly his airplanes and let Nichols worry about the loan.' He further testified that he personally attempted to procure the loan from several banking institutions in the immediate area and in New York prior to July 3d, but without success.

"On July 5th the broker conferred with Col. Alois by telephone stating he could procure the mortgage loan but should have an extension of the time limited therefor, which had expired. He further informed him he had not cooperated. Col. Alois agreed to consider the matter and, accordingly, an extension agreement was prepared and presented to him at his home by Mr. Abell on the evening of July 5th. Col. Alois agreed to have his attorney examine the agreement and communicate with the broker the next day. He did not appear at the broker's office on the 6th. On July 8th, the sales manager for the broker visited the Alois home, at which time Col. Alois informed him he had decided not to sign the extension agreement as prepared but that he would be interested in an agreement with the owners to buy at a reduced price of $32,000 or a rental agreement with an option to purchase. On July 9th the sales manager reported to Col. Alois that the owners were not interested in either of his counter proposals. Col. Alois then demanded the return of his deposit of $3,500. On July 14th, Col. and Mrs. Alois purchased another property in Anne Arundel County for the price of $20,000 and called at the office of the broker and again demanded the return of their deposit, which was refused.

"After the broker learned of the refusal of Monumental * * * to approve a mortgage loan on the property in the principal amount of $21,000, he contacted Aurora Federal, Loyola, and Wyman Park Loan Associations, about June 25th and had a verbal commitment from each of them that they would approve a mortgage loan for $21,000 on the property on application and subject to credit report on the borrowers and inspection of the property. The broker testified that he was in touch with a number of Building and Loan Associations daily and that he could have called ten or fifteen

such associations and placed the loan subject to application, credit report and inspection of the property. The broker further stated that he did not apply to any of the Building and Loan Associations prior to June 25th because he was confident the loan could be secured from Monumental * * *.

"The Vice-President of Fraternity Building and Loan Association [Mr. Etzler] testified he inspected the property on February 11, 1958, and read the contract and that his association would have approved the loan in the desired amount had they been approached in the matter. This association was authorized to loan up to 75 per cent of the contract price. Dr. Waldman testified that had he been advised of the situation in respect to procurement of the mortgage, he would have hypothecated $3,000 in securities with Monumental * * * or have loaned the entire mortgage himself as a last resort."

A contention, made below, that the contract of sale was too vague and uncertain to be enforceable, was not pressed on this appeal. The appellants contend that the trial court was clearly in error in finding that the appellants hindered or prevented the procuring of the loan. But we think, from the admissions of Col. Alois alone, it appears that he was informed of the broker's repeated efforts to reach him prior to June 30th, and he knew from his interview with Monumental, if he did not know before, that some cooperation on his part, at least to sign an application and furnish information, was a necessary prerequisite to the obtaining of a loan. It also seems clear that, despite repeated efforts, the broker was unable to reach him before the deadline of July 3d. No doubt it would have been better if the broker had given him written instructions, but the telephone calls to Mrs. Alois, who was a party to the contract, served the same purpose and put him fairly on notice that his cooperation was desired.

The case of *Shea v. Marton*, 214 Md. 539, relied on by the appellants, is readily distinguishable. There, the buyer had, in effect, an option to buy at a certain price if he obtained a rezoning of the property within five months. He failed to obtain it, and specific performance was denied. The owners assumed no obligation in connection with the rezoning. The

buyers in the instant case were under an implied obligation to cooperate with the broker. Obviously the broker could not do more than to bring the parties together. By refusing to communicate with the broker within the time prescribed, performance was hindered or prevented. It is well settled that, where cooperation is necessary to the performance of a condition, a duty to cooperate will be implied, and that a party owing such a duty cannot prevail if such failure operates to hinder or prevent performance of the condition. See Restatement, *Contracts,* § 315(1) and § 395, Comment c; Williston, *Contracts,* (Rev. Ed.) §§ 1293, 1293A. Cf. *Black v. Woodrow,* 39 Md. 194, 215; *Milske v. Steiner Mantel Co.,* 103 Md. 235, 249; *Vanadium Corporation v. Fidelity & Deposit Co.,* 159 F. 2d 105, 108 (C. C. A. 2d); *Griffith v. Scheungrab,* 219 Md. 27, 34.

The appellants cite Restatement, *Contracts,* § 315(2), and Corbin, *Contracts,* Sec. 947, for the proposition that acts that would have been sufficient to hinder or prevent the occurrence of a condition are not a breach of condition "if the condition would not have occurred or the return promise have been performed had those acts not been done." In its very nature such proof is hypothetical. The appellants contend that there was no evidence that the broker would have been able to procure the loan if the buyers had cooperated and that the testimony of Mr. Etzler was inadmissible. We do not agree. The broker testified that he had verbal commitments, and that was as far as he could go without assistance from the buyers. Further efforts on his part were frustrated by the buyers' conduct. It may be noted that the buyers repudiated the contract at least three weeks before the settlement date, August 1, 1957. The testimony of Mr. Etzler was not too speculative. He inspected the property and testified that he reported his findings to the Loan Committee, who agreed that they would have approved the loan at the time "the contract was supposed to be in effect." There was an objection that his testimony was "in part hearsay." If we assume that the objection was well taken, his own investigation and recommendation was not hearsay. The testimony of Dr. Waldman

that he would have met the conditions of the Monumental loan, or taken the mortgage himself, was likewise relevant to show the probability of the broker's ability to meet the condition.

The appellants contend that the counterclaim for damages was improperly allowed. It is admitted that the Aloises visited the Waldmans on June 15, 1957, and the latter agreed to move out on July 30th. On June 17th Dr. Waldman gave up the lease of a furnished apartment in Philadelphia, where he was employed and had his principal place of abode, and signed a one-year lease of a large unfurnished apartment. The difference between the yearly rent of the large apartment and that of the one he had previously occupied was $1,200. He also moved about one-half of his furniture and belongings to the large apartment at a cost of $192.88, prior to July 3, 1957. The court allowed these items as damages, totaling $1,392.88. The appellants contend that the sellers were not justified in making these arrangements before July 3d, the earliest date when they could know whether the condition would be met, that the proposed arrangements were not communicated to the buyers, and that the special damage claimed was not in contemplation of the parties but resulted from a collateral undertaking, citing *Webster v. Woolford,* 81 Md. 329, 332. It is also suggested that even in the event of full performance by the buyers the expenses in question would have to be borne by the owners. Cf. Restatement, *Contracts,* § 333. The appellees contend that the expenditures were reasonably foreseeable and made as a direct consequence, or in reliance upon, the contract dated June 1, 1957. We find it unnecessary to pass on these contentions since we think the counterclaim must be disallowed for another reason.

In defending their right to retain the deposit, the owners asserted in their third plea that the buyers "forfeited their right to a return of the deposit of $3,500." The contract of sale is silent as to what disposition was to be made of the deposit in the event of a default by the buyers. We had occasion in a recent case to discuss the problem posed by a buyer's claim for a return of a deposit upon the theory of

unjust enrichment. See *Quillen v. Kelley,* 216 Md. 396, 401 *et seq.* and note 31 A. L. R. 2d 8, 96. We denied the claim in that case, among other reasons, because of a failure to show that the amount exceeded the sellers' potential loss. See also *Great United Realty Co. v. Lewis,* 203 Md. 442, 446. In the instant case it would seem that the retention of the deposit by the sellers could be supported on the theory that it was in the nature of liquidated damages rather than a penalty. See *Willson v. M. & C. C. of Baltimore,* 83 Md. 203, 214 *et seq.* and note 6 A. L. R. 2d 1401. It has been held that one cannot forfeit the deposit as liquidated damages and at the same time make claim for actual damages. *Brook Haven, Inc. v. Silverman,* 120 A. 2d 591, 592 (Mun. C. A., D. C.), citing *MacNamee v. Hermann,* 53 F. 2d 549 (C. A., D. C.); *Kaplan v. Walsh,* 72 N. Y. S. 2d 455. Other cases to the same effect are cited in notes 97 A. L. R. 1493 and 6 A. L. R. 2d, *supra,* 1445. Cf. *United Surety Co. v. Summers,* 110 Md. 95, 111; *Cowan v. Meyer,* 125 Md. 450, 465. It would seem to be improper, as the cases indicate, to allow both.

There are cases in which a deposit has been treated as a mere fund out of which damages may be paid. See *Royer v. Carter,* 233 P. 2d 539 (Cal.). See also Williston, *Contracts,* (Rev. Ed.) § 790; Corbin, *Contracts,* § 1074. We find no evidence to support such a theory in the instant case, but if there were, the proof falls short of establishing a claim in excess of the deposit. We have noted the broker's plea to the third-party claim that he had paid one-half of the deposit to the owners under an agreement, the terms of which are not stated. If the agreement was that the owner should keep the sum so paid, it is in excess of the damages established. The liability of the owners to the broker was not claimed as an element of damage and was not in issue. It was certainly not established by the owners as an element of the damages. When asked whether he had incurred any expenses other than the items allowed, Dr. Waldman referred only to a potential obligation to pay a lawyer's fee, and that was in vague terms. We need not explore the matter further, because we think that the appellees, under the pleadings

and proof in the instant case, could not be allowed damages over and above the forfeiture of the deposit.

> *Judgment in the original suit affirmed; judgment on the counterclaim reversed; costs to be paid equally by the parties.*