Levicoff, Appellant, *v.* Richard I. Rubin & Co.

Argued November 13, 1963. Before BELL, C. J., MUS-MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*Martin Heller*, with him *Maximillian J. Klinger*, for appellant.

*Bernard M. Borish*, with him *Judah I. Labovitz*, *Alan J. Davis*, and *Wolf, Block, Schorr and Solis-Cohen*, for appellees.

OPINION BY MR. JUSTICE MUSMANNO, January 7, 1964:

136

Some time prior to May, 1960, Anne E. McCabe, owner of a tract of land in Philadelphia, decided to erect on it a shopping center and call it the Ridge & Domino Lane Center. As is customary in these operations, which are having a tremendous impact on the buying habits and domestic routine of nearly the whole nation's buying population, Miss McCabe, through her agents, Richard I. Rubin & Co., Inc., sought to obtain lessees in anticipation of the center's actual construction. To this end, the Rubin Co., as agents for the lessor, entered into a lease with Bernard Levicoff whereby the latter would lease a store unit which was to be constructed especially for him.

The written lease, executed May 16, 1960, provided that the lessee's store was to be built in accordance with plans prepared by the lessor but that the lessor was required to incorporate "the lessee's requirements" as submitted by him. Immediately after the signing of the lease, R. I. Rubin, president of the R. I. Rubin Co., informed Levicoff that he should submit to him a plan of his intended store so that it could be incorporated into the "over-all architectural plan of the center." Levicoff agreed to submit such a plan, but by October 17, 1960, had not done so, even though Rubin continued to ask him for the plan throughout the five-month period. Accordingly on that day, October 17, 1960, Rubin wrote Levicoff that the lease had been cancelled. Shortly thereafter Levicoff did mail Rubin a sketch of his proposed store, but on November 3, 1960, Rubin notified Levicoff by letter that the cancellation of the lease remained unchanged.

On June 8, 1961, Levicoff filed in equity a complaint against the agent and the lessor seeking specific performance of the lease agreement. The defendants filed an answer averring the due cancellation of the lease as a result of the plaintiff's refusal to cooperate with the lessor. The case came on for trial, the chancellor

found for the defendants, and the plaintiff's complaint was dismissed. The plaintiff appealed.

In many controverted cases there is one factor of evidence which, like the hinge of a door, is the principal item on which the door of decision turns. The record would indicate that that pivotal factor in this case is procrastination. The defendants found it impossible to get the plaintiff to act. Rubin testified that he tried to get Levicoff at least a dozen times, succeeded in reaching him a half dozen times; and in each instance Levicoff was reminded that he should give the lessor a plan or sketch of his store. Levicoff always replied that he would do so—but he never did.

Paragraph 53 of the lease provided, inter alia: "Lessor will cause the premises to be erected in a good workmanlike manner free and clear of all defects and in accordance with plans and specifications prepared by and at the cost of the Lessor and approved by the Lessee within five (5) days after Lessor's delivery of such plans and specifications to the Lessee. *If for any reason whatsoever, the said plans and specifications are not prepared, delivered and approved in the manner and at the time above set forth, this agreement shall be null and void and of no further force and effect."* (Emphasis supplied.)

The defendants could have done little else but cancel the lease when the lessee by continued procrastination made it impossible for the defendants to execute the contract through the erection of a store suitable for the plaintiff's purposes. It would not have been unreasonable for anyone to conclude, considering the plaintiff's conduct, that he had lost interest in the enterprise. He argued later that he had not, but actions speak louder than words, and inaction outweighs an encyclopedia of explanation.

Once a solemn commitment, which involves the rights of others, is entered into, the law expects the

parties not to imitate the torpor of the sloth or the sluggishness of the snail, nor is the patience of Job invited. The law assumes that the parties will act with the dispatch that the situation demands because the rights of even others, like gathering clouds, may always be coming up over the horizon. Levicoff's inertia could have impeded the completion of the enterprise. The lower court pointed out that "Construction of the shopping center was already well under way at the time the defendant notified the plaintiff of the cancellation."

Levicoff contends that there was nothing in the lease which imposed upon him the obligation to prepare a plan, but if he wanted a store which would meet his needs, the simplest reading of the agreement would inform him that he was to cooperate with the lessor in the preparation and approval of a plan satisfactory to him.

"If the situation is such that the cooperation of one party is an essential prerequisite to performance by the other, there is not only a condition implied in fact qualifying the promise of the latter, but also an implied promise by the former to give the necessary cooperation." (3 Williston on Contracts, 1956 (Rev. Ed. 1936))

A fundamental regard for Levicoff's own protection would have dictated his cooperation with the defendants. Common sense is always an invisible person present at the drafting and signing of a contract.

Comment c of Section 395, Restatement, Contracts, summarizes the concept of cooperation as follows: "Performance of a promise frequently requires cooperation by the promisee. When this is true, the requisite co-operation is a condition qualifying the promisor's duty."

The United States Third Circuit Court of Appeals declared in *Rainier v. Champion Container Co.*, 294

F. 2d 96, that: "It is well settled that where one party
to a contract is himself the cause of a failure of per-
formance by the other party, he cannot advantageously
utilize his own fault as an exit of escape from the per-
formance of his contractual obligations." This prin-
ciple was affirmed in two cases decided by the Supreme
Court of Maryland: *Alois v. Waldman,* 219 Md. 369,
149 A. 2d 406; *Griffith v. Scheungrab,* 219 Md. 267,
146 A. 2d 864.

Paragraph 53 of the lease, as already quoted, stipu-
lated that the lessor could not proceed without the
lessee's approval of the lessor's plan. Obviously, the
best way to approve of the lessor's plan would be to
give the lessor the plan the lessee wanted, and for
which the lessor persistently clamored. Levicoff ad-
mits that Rubin asked him for his (Levicoff's) plan:
"Well, I was supposed to make up the plans of the
store, the store plan and send it to him."

But he attempted to justify his failure to comply
with the defendants' request because, he said, "of the
offhanded manner in which I was asked to prepare
plans."

What could be offhand about a request for a plan
for a store which Levicoff was to occupy, a plan which
it was to his interest to supply if he really wanted the
store, Levicoff did not explain. Even if Levicoff be-
lieved that the lessors should have submitted their
plan first, and the lessors refused to do so, Levicoff
could have enforced his claim by observing Paragraph
39 of the lease which provided: "Lessor shall in no
event be charged with default in the performance of
any of its obligations hereunder unless and until
Lessor shall have failed to perform such obligations
within thirty (30) days . . . after written notice by
Lessee to Lessor properly specifying wherein Lessor
has failed to perform any such obligation."

But Levicoff sent no such written notice which
would have been the catalyst to resolve the situation

30 days after sending it. Levicoff's indifference was constant to the end. He states that finally his brother-in-law did prepare a plan and he sent it to the defendants at about the time the defendants were cancelling the lease. Upon receipt of the plan, which the lessor described as an "improvised rough sketch," and inadequate, the defendants wrote Levicoff on November 3, 1960, re-affirming their letter of cancellation of October 17th and stating specifically: "As we previously advised you, your lease is no longer in effect, and if you wish to have your deposit refunded, please contact this office immediately." .

Even this second notice of the lease's cancellation did not arouse in the plaintiff's breast the slumbering lion of indignation. The chancellor was surprised at the lessee's continuing somnolence and asked him at the trial: "Did you ever write to him, saying: 'Look, you cannot cancel this lease?'" Levicoff replied, No. The only positive action he did take was to throw the defendants' letter into the waste basket. The plaintiff's whole attitude can be likened to that of a pedestrian who ignores the bus which waits ten minutes for him to board and then when the bus departs he runs after it, demanding admittance and a ride. The plaintiff's legal bus in this case left when for five months he stood with his hands in his pocket, declining a cooperation which the situation demanded of him.

Still seeking to avoid the consequences of his own supine dilatoriness, the plaintiff finally argues that the testimony of the conversations between him and Rubin, following the signing of the lease, concerning the submission of plans, was inadmissible on the basis that it amounted to parol testimony designed to alter a written contract. The law does not prohibit two parties to a contract agreeing upon the meaning of certain phraseology in the contract,* and there can be

---

* *Phila. Sav. Fund Soc. v. Stern*, 343 Pa. 534, 537.

no doubt that the plaintiff and the defendants were of one mind in the interpretation that he, the plaintiff, was to submit a sketch of his intended store. However, even if the oral conversation could be interpreted as parol testimony affecting a written contract, it still would not be excluded as pertinent and competent evidence, since parties to a contract may any time subsequently agree to alter a written contract. As stated by Chief Justice BELL in the case of *Elliott-Lewis Corp. v. York-Shipley*, 372 Pa. 346: "The Parol Evidence Rule which prohibits the admission of oral evidence to vary or contradict a written contract does not apply to or prohibit a subsequent modification by parol; it applies only to prior or contemporaneous statements or agreements which induced the written agreement in question ... It is well settled that a written agreement may be modified by a subsequent (written or) oral agreement and that this modification may be shown by writings or by words or by conduct or by all three."

The lower court found that the plaintiff was not entitled to specific performance, the agreement having been properly cancelled because of the plaintiff's failure to supply the plans needed for the store which was to be erected for the plaintiff. We find no error in this conclusion, nor in any of the other conclusions reached by the court.

Decree affirmed, with costs on the appellant.