**J. J. GUMBERG CO., a Corporation,**
**Appellee,**

v.

**WALWORTH COMPANY, a Corporation,**
**Appellant.**

**No. 14965.**

United States Court of Appeals
Third Circuit.

Argued Jan. 21, 1965.

Decided June 4, 1965.

Judd N. Poffinberger, Jr., Kirkpatrick, Pomeroy, Lockhart & Johnson, Pittsburgh, Pa. (Joseph A. Katarincic, Kirkpatrick, Pomeroy, Lockhart & Johnson, Pittsburgh, Pa., on the brief), for appellant.

G. W. Wilde, Pittsburgh, Pa., for appellee.

Before McLAUGHLIN, FORMAN, and GANEY, Circuit Judges.

McLAUGHLIN, Circuit Judge.

This is a diversity contract action in which appellee, real estate broker, sued appellant for a commission for producing a purchaser ready, willing and able to purchase certain real estate in Shaler Township, Allegheny County, Pennsylvania as appellee claimed appellant had commissioned it to do. The case was tried to the court and resulted in a finding that appellee was entitled to its commission as it contended.

Appellant urges that (1) Gumberg Co. did not produce a purchaser ready, willing and able to contract and (2) that Gumberg Co. was not entitled to a commission until consummation of the transaction, including payment of the purchase price.

There is not much dispute regarding the underlying facts. From our own study of the record, there is convincing evidence to support the following factual exposition. Appellee's Stanley Gumberg in 1957, acting for the owners of the particular land involved then unimproved, sold it to appellant. The latter erected a warehouse on it and the following year sold it with a long lease back arrangement to Northwestern Mutual Life Insurance Company. Under that lease appellant had the right to cancel it and repurchase the property in the event of condemnation of all or any part of it; lawful restriction of its use; destruction of all or substantially all of the improvements on the property by fire or other casualty.

Early in April 1961, appellant announced it intended to discontinue all its branch warehouse facilities in the United States. Stanley Gumberg learning of this talked by telephone to Hellmuth Strauss, vice president of appellant, asking if Walworth was planning to dispose of its Shaler warehouse. Strauss called back the following day, April 19, 1961. Gumberg said Strauss told him that any dealings with respect to the Shaler property would be with him. He stated that it could be

leased for the balance of Walworth's term which would be between fifteen and twenty years at $80,000 a year and that he could make the property available for sale for $800,000. Gumberg told Strauss that Duquesne Light Company and American Optical Company were both looking for places similar to that of Walworth at Shaler. Gumberg knew that Walworth was in the premises under a lease back. He was not familiar with the terms of repurchase. He inspected the building. He saw the lease but examined and recopied only the rental schedule and the repurchase prices. Carr, the warehouse manager, understood from Gumberg that he had done business with Northwestern and anticipated no trouble with that concern as to repurchase. Appellee, through its Samuel Bankovich, from April 19, 1961 for twenty days thereafter worked with the Duquesne Company to ascertain whether the Walworth building was suitable for its purposes. During the period Gumberg Company showed the premises to a number of other prospects. There were no offers from any of these either to buy or rent. In early May 1961 Gumberg advised Strauss that Duquesne was interested in purchasing the premises, "However, if Walworth Company insisted upon $800,000 Duquesne Light Company was not interested, nor could they be interested." Gumberg said Strauss told him to go back to Duquesne "with the price of $630,000.", and Walworth to pay the transfer taxes and commission. Those figures would have netted Walworth approximately $583,000. Gumberg testified that such amount was discussed with Strauss and that the latter at that time authorized him to sell for $630,000, without any conditions other than that Walworth would pay the transfer taxes and real estate commission. Prior to May 25th Duquesne assured Gumberg the price would be acceptable but that it needed until July 14th in which to obtain its directors' formal approval. Gumberg on May 25th informed Strauss that Duquesne needed until July 14th for its directors' approval. The only other matter discussed with Strauss was as to when Walworth could vacate the warehouse. Specifically, nothing was said by Strauss or Simon, secretary and counsel of Walworth, concerning the necessity of obtaining Northwestern's approval. Gumberg asked Simon to prepare the general closing papers. Later he received the promised letter from Duquesne (P Ex 1) dated June 23rd which confirmed the transaction. He notified Strauss of this and at the latter's direction sent the letter to him. On June 27th Gumberg called Strauss by telephone. Strauss told him a problem had developed but did not mention its nature. Strauss found the difficulty to be that Walworth did not have the right to repurchase the property in the then present circumstances as had been presumed and that Northwestern would not sell it. Gumberg did not think that Duquesne ever withdrew its offer but that it simply "realized that the situation was hopeless and therefore just sort of faded out of existence." He said that later Duquesne bought the land directly behind Walworth's and put up its own building.

On June 2, 1961, Walworth asked Northwestern for a ninety day option to repurchase the warehouse at a price of $515,000. Northwestern answered that the property was a long term investment and that the company was usually not interested in disposing of such type of asset after holding it for only a short while. It suggested Walworth endeavor to sublease the place instead of selling it and if unsuccessful in this to advise Northwestern of the best price available for the premises at which time a decision could be made regarding a sale. Walworth never signed the acceptance of the Duquesne letter proposal. After Walworth had received the mentioned letter, it did attempt to buy the warehouse premises from Northwestern for $550,000. It did not advise Northwestern it had an offer of $630,000. Gumberg and a Northwestern representative were unsuccessful in persuading Duquesne to take the warehouse on lease. As of trial time

Northwestern still owned the property, by that time vacant, and Walworth continued to pay the rent under its lease.

■ Appellant argues that in Duquesne, Gumberg did not produce a purchaser ready, willing and able to contract to buy its warehouse. It urges that Duquesne's request for an option until its board of directors had the opportunity to meet and formally approve of Walworth's offer merely amounted to a counter offer. There is nothing in this record including particularly P Ex 1, the Duquesne letter of June 24, 1961,[1] which presents any valid support for that position. Duquesne in so many words expressed its intention to buy the premises upon the terms agreed between it and Walworth but needed the approval of its directors at their July 14th meeting prior to entering into a formal contract. There

was never the slightest indication but that the Board would so approve. Walworth however did not sign and return the letter. Instead, from early that month it had been endeavoring to purchase the property from the insurance company owner. Though that company had asked Walworth to inform it of the best offer to buy, Walworth did not tell the company of the $630,000 agreed price with Duquesne. Actually, as has been noted, Walworth tried to obtain the premises from Northwestern first, for $515,000 and later for $550,000, during the period it had the Duquesne proposal of $630,000. Plainly the latter sale was defeated solely because Walworth was unable to deliver the property. Gumberg had no responsibility for that. Its commitment, which it fulfilled, was to produce a purchaser ready, able and will-

[1.] "DUQUESNE LIGHT COMPANY
435 Sixth Avenue
Pittsburgh 19, Pennsylvania
June 23, 1961
PHILIP A. FLEGER
Chairman of the Board and President
In re: Purchase of the Walworth Company property situate at 1901 William Flynn Highway (Route No. 8), Shaler Township, Allegheny County, Pennsylvania
J. J. Gumberg Company
Agent for Walworth Company
427 Fourth Avenue
Pittsburgh 19, Pennsylvania
Attention: Mr. Stanley Gumberg
Gentlemen:
   This letter will confirm our recent informal agreement whereby Duquesne Light Company expressed its intention to purchase the above described property subject to approval by the Board of Directors of this Company, for a total consideration of $630,000.
   It is hereby understood and agreed that the sale shall be made upon the following terms and conditions:
   1. An option for a nominal consideration shall be granted by the Walworth Company to Duquesne Light Company to purchase said above described property. Duquesne Light Company shall have until July 14, 1961 to exercise said option. Upon exercising said option, Duquesne Light Company shall deposit $63,000 as hand money which shall be deducted from the purchase price.

   2. Closing shall take place on or before September 29, 1961 at which time the balance of the purchase price shall be paid upon delivery of deed.
   3. Possession of the property shall be turned over to Duquesne Light Company upon delivery of deed.
   4. Real estate taxes and any charges for utilities shall be pro rated as of the date of the delivery of deed.
   5. Insurance coverage shall be continued by the Walworth Company on said property until the date of closing and their policy of insurance shall be endorsed to cover Duquesne Light Company's interest in said property.
   6. Walworth Company shall be responsible for all federal, state and any and all local realty transfer tax stamps.
   It will be appreciated if Walworth Company will signify its acceptance of the above terms and conditions by signing the Acceptance appearing at the bottom of this letter and returning a duplicate executed copy of the same to the undersigned.
                    Very truly yours,
                         PHILIP A. FLEGER
                    ACCEPTANCE
   Above terms and conditions hereby accepted and approved:
WALWORTH COMPANY
By: ............ Dated June ..., 1961"
     President

ing to buy on Walworth's expressed terms. There was no misunderstanding on the part of appellant. The provision in the Duquesne letter for Walworth to sign and return the option agreement, far from showing lack of "congruence" on the terms of the sale, meant that Walworth was to approve in writing the terms to which both parties had agreed. The evidence gives every indication that those approved terms would then have been submitted to and approved by the Duquesne Board at its July meeting. There was nothing in this branch of the transaction to signal the counter offer appellant suggests. There were no special incidents in Gumberg's representation of Walworth. It was to produce a proper buyer which it did. There were no other terms or conditions that Walworth desired in the agreement. We do not have a situation as was before the Court in Smith v. McCann, 205 Pa. 57, 54 A. 498 (1903). Nor, in the light of the facts, is our problem where the agent merely procures an option as in Miller v. Hays, 71 Pa.Super. 523 (1919).

Even though Walworth had no legal right at the time to force the return of the warehouse facility to it, probably the only real reason this sale was not consummated was because Walworth overplayed its hand with Northwestern in not informing that concern of Duquesne's $630,000 offer.

Within this caption appellant contends that it could have and did defeat Gumberg's commission by simply not performing its agreement with Duquesne. In taking this position appellant overlooks the unescapable fact that its relationship with its agent Gumberg was completely independent of such negative action. Gumberg had fully performed its bona fide assignment for appellant. It had produced a buyer. If Walworth could not or would not go through with the sale to the buyer that did not alter its obligation to pay the Gumberg Company its earned commission.

Appellant's other argument is that the Gumberg Company was not entitled to a commission until such time as the sale of the warehouse was consummated and Walworth released from its obligations as tenant. That argument is well answered by appellant in its brief when it states: "Where it is implicit under the circumstances that the payment of the broker's commission is contingent on consummation of the transaction, no commission is earned and due until the transaction is consummated, including the payment of the purchase price. * * The same is true where the circumstances show that the owner and the broker understood that no obligation to pay a commission would arise until the owner accepted and executed an agreement of sale." We consider these principles sound. We also consider that they are not applicable to this appeal. The trial court found on overwhelming evidence that Mr. Gumberg had fulfilled his obligation to Walworth when he produced Duquesne ready, willing and able to buy on Walworth's expressed terms. Those terms were never repudiated by Walworth. The latter, as later developments showed, just did not have the existent right to deliver the property and by reason of the questionable way it dealt with its lessor lost the excellent opportunity it had to obtain the right. The trial court correctly decided that under the facts "Walworth's inability to acquire title, therefore, did not discharge its contractual obligation to pay the Gumberg Co. a commission upon the production of a ready, willing and able purchaser." See Restatement, Contracts § 455; Rick v. Moyer, 296 Pa. 176, 178, 180, 145 A. 793 (1929). As said in Simon v. H. K. Porter Co., 407 Pa. 359, 362, 180 A.2d 227, 229 (1962):

"A broker earns his commission when he produces a purchaser who is ready, willing and able to contract at the price and terms fixed by the vendor-principal, notwithstanding the refusal of the principal to sign the agreement of sale, Wilson v. Hays, 283 Pa. 271, 129 A. 59 (1925), or without reference to the outcome of the sale, Schamberg v. Kahn, 279 Pa. 477, 124 A. 138 (1924). See also

Detchon v. McSorley, 301 Pa. 493, 152 A. 689 (1930); Perry v. Spellman, 194 Pa.Super. 555, 168 A.2d 615 (1961)."

See also Aber v. Pennsylvania Company for Insurance, 269 Pa. 384, 112 A. 444 (1920); Clark v. Battaglia, 47 Pa.Super. 290 (1911).

Neither side comes to grips on the question as to whether Pennsylvania or New York law governs the Gumberg-Walworth agreement. The governing legal principles are sound, current general law and followed both in Pennsylvania and in New York. See Rainier v. Champion Container Co., 294 F.2d 96 (3 Cir. 1961) which had a quite similar factual situation involving an admittedly New York contract and upheld substantially the same result as here. While Rainier dealt with New York law, it is cited for that very point in Levicoff v. Richard I. Rubin and Co., 413 Pa. 134, 139, 196 A.2d 359 (1964).

The judgment of the district court will be affirmed.