S. L. HAMMERMAN ORGANIZATION, INC. *v.*
COMMUNITY HEALTH FACILITIES, INC.

[No. 99, September Term, 1971.]

*Decided December 16, 1971.*

The cause was argued before HAMMOND, C. J. and BARNES, McWILLIAMS, SMITH and DIGGES, JJ.

*Herbert Better* and *John J. Ghingher, Jr.*, with whom were *Weinberg & Green* on the brief, for appellant.

*John Henry Lewin, Jr.*, with whom were *Benjamin R. Civiletti* and *Venable, Baetjer & Howard* on the brief, for appellee.

McWILLIAMS, J., delivered the opinion of the Court.

In the Superior Court of Baltimore City both parties demanded summary judgment, each denying the existence of a dispute in respect of any material fact. The trial judge, Cole, J., hearkened to the behest of the appellee (Community) and gave judgment in its favor. The appellant (Hammerman) says Judge Cole was all wrong, that it should have been the other way around. We shall affirm the judgment.

Hammerman calls itself a realtor and a mortgage banker. Community is a creature of Dr. Joseph B. Francus and Richard Rynd, entrepreneurs in the nursing home business. Milton Schwaber's name is mentioned here and there in the record but neither the nature nor the extent of his interest in Community appears. The project which begat this litigation is known as the Pikesville Nursing Home.

Early in 1968 Pikesville Nursing Home, Inc.[1] by Dr. Francus, its "sponsor," applied to James W. Rouse & Company, Incorporated (Rouse) and the Federal Housing Administration (FHA) for a loan of $1,450,000. Rouse appended to the application a request for the issuance of a commitment by FHA that it would insure the

---

1. The record does not show how Pikesville Nursing Home, Inc., came to be Community Health Facilities, Inc.

mortgage securing the loan. Since it becomes significant later on, we have set forth below section "H. Total Requirements for Settlement" precisely as it appears in the application:

> "H. TOTAL REQUIREMENTS FOR SETTLE-
> MENT:

| | | |
|---|---|---|
| 70. DEVELOPMENT COSTS | | $1,481,500 |
| 71. LAND INDEBTEDNESS (Cash required for land acquisition) | | $ 124,000 |
| 72. SUBTOTAL | | $1,605,500 |
| 73. *LESS* Mortgage Amount | | $1,450,000 |
| 74. *LESS* Fees Paid by Other than Cash | | $ -- |
| 75. EQUITY INVESTMENT REQUIRED | | $ 155,500 |
| 76. INITIAL OPERATING DEFICIT | | $ |
| 77. ANTICIPATED DISCOUNT | | $ 72,500 |
| 78. Working Cap. (2% of Mtge Amount) | Letter of | $ |
| 79. ADD Off-site Construction Costs | Credit | $ |
| 80. TOTAL ESTIMATED CASH REQUIREMENT | | $ 228,000" |

Why no figure was inserted in line 78 we are unable to say. It is obvious however that two per centum of $1,-450,000 is $29,000. If $29,000 is added to the "Total Estimated Cash Requirement" figure of $228,000 (line 80) then the total estimated cash requirement would seem to be $257,000. Whether the words "Letter of Credit" were intended to apply to the $29,000, to the $228,000, to the $257,000, or to some other figure then undetermined, is not wholly clear.

In October 1968 Dr. Francus had become disenchanted

with Rouse. In the words of Herman Hammerman (Herman), at the time the executive vice president of Hammerman, Dr. Francus "bemoaned the fact that nothing was happening." Because, in respect of an earlier matter, they had enjoyed a mutually satisfactory relationship Community retained Hammerman "to expedite" the Pikesville application as filed by Rouse. "Your fee," said Community, "will be $25,000 payable if and when we receive a commitment acceptable to us within 90 days from today [22 October 1968]." Herman "got busy immediately." He was "familiar with [FHA] procedures and with the people with whom * * * [one] had to do business." He modestly agreed that his "know-how" and his entree at FHA made it possible for him to "receive perhaps a little more consideration than somebody coming in cold." FHA officials promised Herman on five separate occasions that the commitment would be ready in a few weeks. In mid-January, when he realized it would not be forthcoming before the expiration of the 90 day period, he sought and obtained from Community a second arrangement. It is found in Floyd Abraham's letter of 27 January, set forth below:

"Mr. Herman Hammerman
S. L. Hammerman Organization, Inc.
10 Light Street
Baltimore, Md. 21202
Dear Herman:
    "The James W. Rouse and Company have relinquished their interest in obtaining FHA mortgage commitments for our Pikesville and Pine Ridge projects, and we hereby appoint you as our exclusive agent.
    "In consideration of your obtaining commitments on these two projects within ninety (90) days from January 16, 1969, we hereby agree to pay a fee of $25,000 on the Pikesville project, and $20,000 on the Pine Ridge project. Each of these fees will be payable *if and when we re-*

*ceive a commitment satisfactory to us within the
time allotted.* [Emphasis added.]

"It is understood that these fees shall constitute the entire fee due you for representing us at FHA and for obtaining the FHA mortgage."

It will be observed that the letter is addressed to Herman personally, rather than to his company. Floyd Abraham was Community's project director. Nothing came of the Pine Ridge project; it is not an issue here.

At this point it should be noted that on 31 December 1968 Community sought the approval of the Securities and Exchange Commission for a public offering of 400,-000 shares of its common stock. Hammerman seems to have been aware of this and it does not say any delay resulted therefrom. Two months later Community formally appointed Hammerman as its "mortgagee for this project."

In his pre-trial deposition Herman testified that on 28 February a "Mr. Knickerbocker of FHA" called him and said he was ready to send the application to Philadelphia "for final approval upon receipt of

a, Letter of credit from bank re: Francus and Rynd;

b, exact balance due on the land;

c, the discount rate;

d, updated financial statements of Francus and Rynd."

Abraham provided Herman with the above mentioned items; he said he (Herman) sent them on to FHA. What the nature of this letter of credit, item a, was we are unable to say but obviously it could not have been the letter of credit ($250,000) hereinafter discussed. He testified further that he told Abraham and Dr. Francus on 12 March that a "letter of credit was a distinct requirement of FHA as preliminary to [the] approval of [the] commitment, as indicated on Line 78 of [the] original application * * *." This appears to have been the first time, except as noted above, that a letter of credit was discussed but no amount seems to have been mentioned. Herman said, in respect of the letter of credit, that he

"offered to approach Equitable [Trust Company] * * * [himself] so that * * * [they] could get going." A day or so later Abraham discussed the case with Allen Clapp, the FHA director. A summary of what transpired at that meeting appears in Clapp's letter of 18 March addressed to Hammerman and directed to the attention of Herman. A copy went to Community. The pertinent part of the letter follows:

> "Last week we discussed the arrangements for financing the Pikesville Nursing Home with the project director, Mr. Floyd Abraham. It was shown that with proposed stock issuance, *sufficient current cash assets would become available* for the cash requirements above the mortgage.
>
> "It was pointed out to Mr. Abraham that an irrevocable letter of credit *could* be used as an interim assurance *until liquid assets became available.* We await *your* decision on this part of the financing. In the meantime, we have placed this project in abeyance awaiting a favorable reply." (Emphasis added.)

Herman testified that on 14 March (which was about the same time Abraham was talking to Clapp at FHA) he "personally went to see Mr. Wennagel, Vice President in Charge of Loans at the Equitable Trust Company." He said Wennagel declined to issue a letter of credit for $235,000 "without the personal guarantee of Mr. Milton Schwaber and his wife." Wennagel wanted a $4,000 fee for the letter of credit but he said this "might be reduced to $2,000 if the SEC approval was forthcoming." Whether Schwaber was ever approached was not shown.

If we go by the record nothing whatever happened between 18 March and 8 April when Community settled with its underwriters and received $3,800,000 in cash for the 400,000 shares of its common stock. Herman said

that on 11 April he "made it very clear to both Abraham and Dr. Francus that we've got to have this letter, the FHA says, 'that's it, you know you've got to have it and that's it,' *and Abraham authorized me to get Wennagel of Equitable to provide [the] letter of credit."* (Emphasis added.) There is in the record a letter, dated 11 April, addressed to Wennagel and signed by Dr. Francus, requesting the issuance of "a letter of credit in the amount of $250,000." Copies to Herman and Clapp of FHA are indicated. Herman said that on 14 April he discussed the amount of the letter of credit with the FHA credit manager who agreed that although $234,998 would be sufficient the letter of credit ought to be for $250,000. Why he did not obtain the letter of credit from Wennagel on that day or on the next day, 15 April, neither Herman nor anyone else has said. The 90 day period expired on 16 April.

Herman said that on 18 April he spoke again to Wennagel who said he would issue the letter upon receipt of a request from Community. (What happened to the letter of 11 April was not shown.) Herman said "he so advised Mr. Abraham." Herman admitted that "as of April 18 * * * no letter of commitment from FHA had been forthcoming." On 1 May he retired from the Hammerman organization without having done anything more about it.

There is in the record the letter which follows:

"Mr. Art Kahn                              April 30, 1969
S. L. Hammerman Organization, Inc.
10 Light Street
Baltimore, Md. 21202
Dear Mr. Kahn:

"As per our telephone conversation, and as per your request, we are hereby notifying you that because you are unable to deliver a commitment for Pikesville and Pine Ridge within the one hundred and eighty (180) days we have

previously allotted you, we are now compelled to seek placement of these mortgages elsewhere.
Sincerely,
COMMUNITY HEALTH FACILITIES, INC.
Joseph B. Francus"

Arthur C. Kahan, a Hammerman vice president, in an affidavit filed in the case, denied "requesting, receiving or ever having seen" the letter of 30 April prior to these proceedings. He also denied the telephone conversation therein mentioned.

Herman was succeeded as executive vice president by Jonas Brodie. On 8 May he (Brodie) sent to Community the letter which follows:

"Gentlemen:
"On March 10, 1969, you were advised by Herman Hammerman of our office that we had obtained the F.H.A. mortgage commitment you had requested for the Pikesville Nursing Home, and that said commitment would be delivered to you upon the filing of Form 2530 and posting a letter of credit. Form 2530 was filed with the F.H.A. on March 18, 1969, but you have never posted the letter of credit about which we have continually reminded you.
"We have performed the services for which we were engaged by your letter of January 27, 1969, and in accordance with our agreement enclose herewith our bill in the amount of $25,-000.00 for which we expect prompt payment."

Brodie stated in his affidavit, in support of Hammerman's motion for summary judgment, that Abraham, on 14 May, submitted to FHA "financial information * * * regarding the public offering in order to persuade the FHA to waive the requirement of the letter of credit" and that several days thereafter he (Brodie) requested the prompt issuance of the commitment. On 22 May, he said, he sent a letter to Community stating he had ad-

vised FHA to issue a commitment for $1,502,000 and demanding $78.00 as the additional application fee. He admitted he received no response to his letter. On 26 June, without the knowledge or consent of Community, Brodie filed a revised application with FHA.

On 27 August FHA, without having received a letter of credit, issued a 60 day commitment to insure a mortgage of $1,502,000. It was rejected by Dr. Francus who said it was not acceptable. He went on to say, in his letter to Brodie, that he did not believe Hammerman was "entitled to the substantial fee" it claimed but, he agreed, it was "entitled to some compensation" for the time and effort expended on the project.

Early in January or February 1969 Community had initiated discussions with representatives of Monumental Life Insurance Company for the purpose of obtaining a commitment to finance the Pikesville project. The discussions continued during the succeeding months. On 3 June Monumental issued its commitment to lend Community $750,000. Community mailed its acceptance on 11 June. Hammerman says it had no knowledge of the negotiations with Monumental. Work on the project was not begun until the summer of 1970.

## I.

Hammerman seems not to question the notion that, in these circumstances, time is of the essence; but, it argues, there is a duty to cooperate when cooperation by one party is necessary to the performance of a contract by the other party. And, of course, it charges Community with a lack of cooperation in that it failed or refused to obtain the letter of credit. Hammerman relies on *Alois v. Waldman,* 219 Md. 369 (1959). Community, taking the position that cooperation, in these circumstances, is not required, relies on *Shea v. Marton,* 214 Md. 539 (1957), and *Clarke v. Lacy,* 213 Md. 482 (1957). We shall not discuss the holdings of those cases because, even if we assume that cooperation *vel non* is an issue here,

we do not see how a conclusion that Community refused or failed to cooperate can be supported.

Herman insists FHA said, "Well, my God, when Rouse made the application, Line No. 78 says, Furnish letter of credit. Francus knew that." But, as we observed early on, Line No. 78 says no such thing. It is one of the items in section "H" which is nothing more than an analysis of the investment required of the applicant over and above the amount of the mortgage. We think it is beyond question that the only concern of FHA, in this regard, was that Community either had that much money or that it would be readily available. Beyond question also is the fact that from 8 April to 16 April, when the 90 days expired, Community had $3,800,000 in cash or, as Herman put it, "all kinds of money." That this would have satisfied FHA is established by the letter of 18 March. Despite the fact that Community had ten times more cash than FHA required, Herman told Abraham and Francus, on 11 April, that FHA had to have the letter of credit "and that's it." Apparently persuaded of the necessity for furnishing the letter of credit they (Abraham and Francus) "authorized * * * [Herman] to get Wennagel of Equitable to provide [the] letter of credit." The letter of the same date, 11 April, requested Equitable to issue a letter of credit in the amount of $250,000. Whether this letter was mailed or handed to Herman for delivery to Equitable is not clear but whether it was one way or the other seems not to matter. We do not understand why, during the five days remaining, Herman could not have obtained the letter of credit and, having obtained it, why he could not have delivered it to FHA. According to him the issuance of the commitment then depended only on the delivery of the letter of credit. It was suggested that this was not possible of accomplishment in the few days remaining. Who but Herman, however, would have been in a better position to know that and, knowing it, why, we wonder, did he not ask to have the 90 day period extended. In January, before the first 90 day period had expired, he

had asked for and had obtained an extension of 90 days. Had Community refused a reasonable extension beyond 16 April the charge of refusal or failure to cooperate just might be supportable but it must not be supposed that we so hold. It will have been observed that the sole basis for Hammerman's contention is the fact that the letter of credit was never issued which seems to become something of an anomaly when we recall that FHA did not require a letter of credit in respect of the commitment issued late in August.

## II.

Hammerman's next complaint, i.e., that Community acted "reprehensibly * * * [and] in bad faith" because it did not tell Hammerman of its discussions with Monumental seems to us to border on the frivolous. Nor would the fact that it had designated Hammerman as its mortgagee seem to make any difference. Indeed Community's officers might well be charged with a lack of diligence had they not investigated other sources of mortgage money. Of course, had Hammerman produced the FHA commitment by 16 April we doubt that Community could have wriggled out of its promise to pay Hammerman the agreed $25,000.

## III.

Hammerman's next and concluding contention is that Community's conduct after 16 April somehow estops it to say that Hammerman's right to receive the $25,000 fee expired on 16 April. In support of this contention Hammerman points to certain facts and circumstances which we shall now discuss.

The first concerns Community's letter of 30 April. Hammerman says it was addressed to Art Kahn. There was no Art Kahn but Arthur C. Kahan denied receiving it. He said also he had no knowledge of the letter nor of the telephone call therein mentioned. It seems to us the letter has no material significance. It need not have been written. The commitment had not been obtained.

The letter neither added to nor subtracted from the rights of either party. If it had been written but not mailed it would seem that the writer's only purpose was to honor the request of Kahan or whoever made the telephone call.

Next there is the assertion that within the two weeks following 30 April Abraham "delivered certain financial information to FHA." This assertion is said to be supported in the record by Brodie's letter of 16 May to FHA. Its single paragraph follows:

> "We understand that Mr. Floyd Abraham delivered to you on May 14th the necessary financial information to indicate that sufficient current cash assets are available for the cash requirements above the mortgage on the subject project, and that accordingly you will not require the letter of credit previously discussed. According to our file, we have now submitted all of the information necessary for you to forward the case to Philadelphia for prompt issuance of your commitment. We look forward to receiving the commitment at your earliest convenience."

Apart from this seemingly self-serving declaration there is nothing in the record which throws any light on what information Abraham may have given FHA on 14 May, or for what purpose, or in connection with what project. Herman and the people at FHA knew, before 16 April, that Community had received $3,800,000. There would seem to be no reason why Abraham would be telling FHA about it five weeks later. He told FHA in March and FHA made it quite clear in the letter of 18 March that the letter of credit would not be required after Community received the $3,800,000. Apparently Brodie did not send a copy of his letter of 16 May to Community and it does not appear that Community knew anything about it.

Millard C. Buxbaum's letter of 8 July 1969 to Hammerman is said to have great significance. He said:

"This is to advise you that I am the accountant for Community Health Facilities, Inc., and that the working capital of this company as at May 31, 1969 was in excess of $400,000.00."

We must assume Buxbaum had some reason for sending the letter but this record does not reveal what it may have been. It will be recalled that early in June Community had accepted Monumental's commitment for the Pikesville project and that Brodie stated in his letter of 16 May to FHA that Hammerman had "now submitted all of the information necessary" for the "prompt issuance of the commitment." It seems unlikely Buxbaum's letter had anything to do with the Pikesville project.

Lastly Hammerman asserts that Community "made no attempt to withdraw its signed application with FHA; and that * * * [Hammerman] corresponded with * * * [Community] after April 30, 1969 concerning the application." We see no significance in the fact that Community did not withdraw its application. The correspondence cited by Hammerman consists of Brodie's letter of 16 May to FHA, Brodie's letter of 22 May to Abraham, and Buxbaum's letter of 8 July. As has been said Brodie did not send to Community a copy of the letter of 16 May. The letter of 22 May purports to advise Abraham that in accordance with their discussion he (Brodie) had advised FHA to issue its "commitment in the amount of $1,502,000 at 7½% interest." He requested a check for $78 "as the additional application fee required by FHA." Neither Abraham nor anyone else on behalf of Community either acknowledged the letter or replied thereto. We have already commented on Buxbaum's letter of 8 July.

Giving Hammerman all the best of it the record does not come near supporting the notion that Community's conduct after 16 April amounts to a waiver of its right

to require performance within the 90 day period or that it is estopped to say that its liability under the January agreement expired on 16 April.

## IV.

It will have been one's first impression that this surely is not a case which ought to have been disposed of by a summary judgment. Yet, while there are indeed a number of minor quibbles, there does not seem to be any dispute in respect of the *material* facts. In conclusion it might be said that perhaps Hammerman's failure to produce the commitment by 16 April was due to Herman's preoccupation with his impending retirement. Brodie, upon his succession, mounted an energetic salvage operation but it was not only too little, it was also too late.

*Judgment affirmed.*
*Costs to be paid by the appellant.*