831 A.2d 18

James REMSBURG, Sr.

v.

Charles MONTGOMERY, et al.

No. 129, Sept. Term, 2002.

Court of Appeals of Maryland.

Aug. 27, 2003.

572

Paul N. Finamore (Brett A. Buckwalter, Niles, Barton & Wilmer, LLP, on brief), Baltimore, for petitioner.

Philip J. McNutt (Hughes & Bentzen, PLLC, on brief), Washington, DC, for respondents.

Argued before BELL, C.J., ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

HARRELL, J.

## I.

On 28 November 1998, James Remsburg, Jr. ("Remsburg Jr."), during a hunting expedition led by this father, James Remsburg, Sr. ("Remsburg Sr."), accidentally shot and wounded Charles and Brian Montgomery. The Montgomerys timely filed suit in the Circuit Court for Frederick County against the Remsburgs alleging trespass and negligence. Remsburg Jr. settled with the Montgomerys and was dismissed from the suit.

Remsburg Sr. filed a Motion for Summary Judgment. He contended that there were no material facts in dispute and that the Montgomerys failed to assert properly the existence of a legally cognizable duty owed by Remsburg Sr. to the Montgomerys to protect them from the negligent acts of a third party, namely Remsburg Jr. The Montgomerys filed a timely opposition. A hearing was held on 15 April 2001, at which time summary judgment was entered for Remsburg Sr. on all counts. The Montgomerys appealed to the Court of Special Appeals.

The Court of Special Appeals issued a reported opinion on 1 November 2002 affirming the Circuit Court judgment as to the trespass count, but vacating with respect to the negligence claim. *Montgomery v. Remsburg,* 147 Md.App. 564, 810 A.2d 14 (2002). As to the latter, the intermediate appellate court

held that "there were factual disputes material to determining whether Remsburg Sr. owed the Montgomerys a special duty to take preventive measures, either by informing them that they [the Remsburgs] intended to hunt in that area, or by giving Remsburg Jr. enough information to alert him to the possibility that other hunters might be present that morning." *Montgomery,* 147 Md.App. at 572, 810 A.2d at 19. Remsburg Sr. then filed a petition for writ of certiorari with this Court, which we granted on 12 March 2003 to determine whether Remsburg Sr. owed such a duty to the Montgomerys. *Remsburg v. Montgomery,* 373 Md. 406, 818 A.2d 1105 (2003).

## II.

At approximately 4:30 a.m. on the morning of 28 November 1998, Brian Montgomery arrived at the Frederick, Maryland, house of his father, Charles Montgomery. Brian, an avid hunter, and Charles, who previously had hunted only smaller animals, proceeded to the northerly edge of the father's property where they hid themselves in underbrush awaiting the official start of deer hunting season.[1] At approximately 6:00 a.m. the two heard what they determined to be the sound of another hunter taking a position in a nearby tree stand. In order to avoid scaring away any deer in the area, and because legal hunting time did not commence for approximately 20 minutes, the Montgomerys prepared to leave the area without alerting any nearby deer or the newly arrived hunter to their presence.

At or about 6:15 a.m., while preparing to depart from his hidden position, Charles Montgomery moved to massage a leg

---

1. Shotgun deer hunting season officially began at 12:01 a.m. on 28 November 1998; however, hunting at night is prohibited by statute, which, at the time of the accident involved in this case, defined "night" as one-half hour after sunset through one-half hour before sunrise. Maryland Code (2002), Natural Resources Article §§ 10–410(b), 10–101(m) (at the time of the accident in question here, the definition of "nighttime" was located at § 10–101(*l*); however, in 2002 this definition was moved, unchanged, to its present location at § 10–101(m)). Sunrise on 28 November 1998 was at 7:06 a.m. in Frederick, Maryland, making the legal start of the hunting season 6:36 a.m.

cramp and was immediately struck by a single projectile. The shotgun slug first grazed Brian's neck, causing a severe abrasion on his neck and temporary deafness, then passed through Charles' upper right arm (injuring the humerus bone, severing the main artery to the upper right arm, and damaging surrounding nerves), before finally lodging in Charles' upper right torso. The Montgomerys soon learned that the shot had been fired by Remsburg Jr., an experienced hunter who, before properly identifying his target and prior to the legal inception of the deer hunting season, had fired from his position in a nearby tree stand. Remsburg Jr., a 27 year old emancipated adult who had participated in over 550 previous hunting outings, was a member of a hunting party organized by his father, Remsburg Sr.

After realizing his mistake, Remsburg Jr. called to his father who was positioned in another tree stand approximately 250 yards away, off the Montgomery property. Remsburg Sr. and other members of the Remsburg hunting party responded to the call. Upon arriving at the scene of the accident, Remsburg Sr. commented, "I guess that rules out telling Jamie [Remsburg Jr.] to shoot at the first thing that moves," and also indicated to Charles Montgomery that he should have been wearing more orange outerwear.

Although the Montgomerys and the Remsburgs respectively were unaware that the members of the other group planned to hunt on that particular section of the Montgomery property on the morning of 28 November 1998, the two families were well acquainted and had a long history of interactions regarding hunting rights on the Montgomery property. For a number of years prior to the pertinent incident, Remsburg Sr. leased hunting rights on the property from James Montgomery, Charles Montgomery's father. This right was granted in exchange for $500, which was paid annually by way of services performed by Remsburg Sr. on the Montgomery farm.[2] After James Montgomery's death in 1995, control of the Montgom-

---

2. The earliest written agreement between James Montgomery and Remsburg Sr. allegedly dated to 1989.

ery farm and property passed to his children, including Charles Montgomery. In the years following James Montgomery's death, Charles Montgomery gave Remsburg Sr. verbal permission to hunt on the Montgomery property; however, Charles asserted in the Circuit Court in this case that he intended to deny Remsburg Sr. permission to hunt on the Montgomery property for the 1998 hunting season, but had not done so because Remsburg Sr. never contacted him prior to 28 November 1998 to secure permission to hunt on the Montgomery property for the approaching deer season.[3]

Whatever the status of his understanding with the Montgomery family, Remsburg Sr. also entered into a written agreement with Howard Payne, in or about 1997, that provided Remsburg Sr. with rights to hunt on Payne's property adjacent to the Montgomery property. On the morning of the accident in this case, all members of Remsburg Sr.'s hunting party, with the exception of Remsburg Jr., were positioned on the Payne property. As noted *supra*, Remsburg Jr. was positioned in a tree stand located on the Montgomery property, which stand had been built years earlier by Remsburg Jr.[4]

In their complaint, the Montgomerys alleged generally that Remsburg Sr. was liable to the Montgomerys for the injuries they sustained as a result of a member of Remsburg Sr.'s hunting party trespassing on the Montgomery property and negligently hunting there. The Montgomerys further alleged that the trespass was at the direction of Remsburg Sr., that Remsburg Sr. negligently breached his duty of care to the

---

**3.** Remsburg Sr. telephoned Charles Montgomery's residence the evening prior to the pertinent incident, leaving, however, only a generic message that he had called. Charles did not return the call. Maryland law requires a hunter on another's private property to secure written permission from the land owner and to keep such permission on his person while on the property. Md.Code (2002), Nat. Res. Art. § 10–411.

**4.** Remsburg Jr. stated in deposition that he was unsure who owned the property on which the tree stand was located, but that he had been hunting from it for 15 years and he had built it there at the suggestion of James Montgomery.

Montgomerys by failing to instruct properly his son in hunting safety and otherwise encouraging his son to participate in unsafe hunting practices, and that Remsburg Sr. negligently entrusted his son with a gun.[5]  Additionally, the Montgomerys charged that Remsburg Sr. owed a duty of care to the Montgomerys by virtue of his joint enterprise and concerted actions with Remsburg Jr.

The Circuit Court granted Remsburg Sr. summary judgment on all counts.  In dismissing the negligence action, the judge observed that the element of "duty would have to arise out of a special relationship under Maryland law, and there just simply is no—its not a factual matter, but there's not any relationship that's proffered or pled or presumed under any theory in Maryland law that would support a finding of liability."  The judge also noted that there was no Maryland precedent supporting an action for bodily damages as a result of a trespass action.[6]

On appeal, the Montgomerys argued to the Court of Special Appeals that the Circuit Court judgment was erroneous as a matter of law because a duty was imposed by both Maryland's hunting laws and the long term relationship between Remsburg Sr. and the Montgomery family.  Additionally, the Montgomerys contended that the existence of such a relationship "is a matter of factual determination to be decided by the trier of fact," and may not be resolved, therefore, in a motion for summary judgment.  They further maintained that summary judgment was granted erroneously because the trial judge drew factual inferences favoring the moving party, Remsburg Sr.

---

**5.**  The Montgomerys subsequently alleged that Remsburg Sr. also actively misled his son to believe that Remsburg Sr. had obtained proper permission to hunt on the Montgomery property.

**6.**  The judge also held that there were no facts alleged that would support the Montgomerys' assertion of joint venture or negligent entrustment.  The Montgomerys, on appeal, did not argue further these theories of recovery.

While refusing to hold that Remsburg Sr. owed a *per se* duty to the Montgomerys, the Court of Special Appeals concluded that a duty may exist if Remsburg Sr. actively induced his son to believe there would be no other persons present in the vicinity on the morning of the accident. *Montgomery*, 147 Md.App. at 595–96, 810 A.2d at 33. The Court of Special Appeals found that there were material facts in genuine dispute regarding this issue to prevent entry of summary judgment.

## III.

Petitioner presents the following questions for our consideration:

(1) whether the Court of Special Appeals applied an incorrect standard of review for summary judgment by considering and relying upon factual proffers that were not supported by, and in some cases were contradicted by, admissible evidence on record;

(2) whether the Court of Special Appeals erred in holding that Remsburg Sr. could owe a duty in tort to the Montgomerys to protect them from the negligent acts of a third party, experienced hunter; and

(3) whether, even if Remsburg Sr. owed a duty to the Montgomerys, the independent act by Remsburg Jr. of shooting was a superceding cause of the Montgomerys' injuries, which relieved Remsburg Sr. of liability.[7]

Because we find the answer to the second question dispositive of this matter, we reach and decide only that question. We conclude as to that, under the undisputed, material facts of the case *sub judice*, Remsburg Sr. had no duty in tort to protect the Montgomerys from the negligent acts of Remsburg Jr. Accordingly, we shall reverse the judgment of the Court of Special Appeals and remand the case to that court with

---

7. In his petition for writ of certiorari, Petitioner posed six questions; however, in his brief to this Court, Petitioner condensed the number of questions to the three recited here.

directions that it affirm in full the judgment of the Circuit Court for Frederick County.

## IV.

Maryland Rule 2–501(e)(2001) provides that:

"the court shall enter judgment in favor of or against the moving party if the motion and response show that there is no genuine dispute as to any material fact *and* that the party in whose favor judgment is entered is entitled to judgment as a matter of law" (*emphasis added*).

An appellate court reviews a trial court's grant of a motion for summary judgment *de novo.* *Todd v. MTA,* 373 Md. 149, 154, 816 A.2d 930, 933 (2003); *Beyer v. Morgan State Univ.* 369 Md. 335, 359, 800 A.2d 707, 721 (2002); *Schmerling v. Injured Workers' Ins. Fund,* 368 Md. 434, 443, 795 A.2d 715, 720 (2002); *see also Fister v. Allstate Life Ins. Co.* 366 Md. 201, 210, 783 A.2d 194, 199 (2001). "The trial court will not determine any disputed facts, but rather makes a ruling as a matter of law. The standard of appellate review, therefore, is whether the trial court was legally correct." *Williams v. Mayor & City Council of Baltimore,* 359 Md. 101, 114, 753 A.2d 41, 48 (2000) (*internal citations omitted*) (quoting *Baltimore Gas & Elec. Co. v. Lane,* 338 Md. 34, 42–43, 656 A.2d 307, 311 (1995)); *see also Eng'g Mgmt. Servs. v. Md. State Highway Admin.,* 375 Md. 211, 229, 825 A.2d 966 (2003) ("[w]hether summary judgment is properly granted as a matter of law is a question of law. The standard for appellate review of a summary judgment is whether it is 'legally correct' ").

When reviewing a grant of summary judgment, we must make the threshold determination as to whether a genuine dispute of material fact exists, and only where such dispute is absent will we proceed to review determinations of law. *See Todd,* 373 Md. at 154–55, 816 A.2d at 933; *Beyer,* 369 Md. at 359–60, 800 A.2d at 721; *Schmerling,* 368 Md. at 443, 795 A.2d at 720. In so doing, we construe the facts properly before the court, and any reasonable inferences that

may be drawn from them, in the light most favorable to the non-moving party. *Todd*, 373 Md. at 155, 816 A.2d at 933 (citing *Okwa v. Harper*, 360 Md. 161, 178, 757 A.2d 118, 127 (2000)).

We have held that neither general denials nor proffered facts which lack detail and precision are sufficient to defeat a properly plead motion for summary judgment. *Beatty v. Trailmaster*, 330 Md. 726, 737–38, 625 A.2d 1005, 1011 (1993)(citing *Lynx, Inc. v. Ordnance Products, Inc.*, 273 Md. 1, 7–8, 327 A.2d 502, 509 (1974)); *see also Goodwich v. Sinai Hospital of Baltimore, Inc.*, 343 Md. 185, 207, 680 A.2d 1067, 1078 (1996) (*citations omitted*). To oppose properly a motion for summary judgment, the facts presented must not only be detailed, but also admissible in evidence. *See Beatty*, 330 Md. at 737–38, 625 A.2d at 1011 (citing *Hoffman Chev. v. Wash. Co. Nat'l Sav.*, 297 Md. 691, 711–15, 467 A.2d 758 (1983); *Shaffer v. Lohr*, 264 Md. 397, 404, 287 A.2d 42 (1972); *Broadfording Church v. Western Md. Ry.*, 262 Md. 84, 89, 277 A.2d 276 (1971)). Furthermore, the mere presence of a factual dispute in general will not render summary judgment improper. *See Beatty*, 330 Md. at 738, 625 A.2d at 1011 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986)). As we explained in *Lippert v. Jung*, 366 Md. 221, 783 A.2d 206 (2001), "a dispute as to facts relating to grounds upon which the decision is not rested is not a dispute with respect to a *material* fact and such dispute does not prevent the entry of summary judgment." 366 Md. at 227, 783 A.2d at 209 (quoting *Salisbury Beauty Schs. v. State Bd. of Cosmetologists*, 268 Md. 32, 40, 300 A.2d 367, 374 (1973)) (Emphasis in original). "Where the record shows that there was no such genuine dispute as to any material fact necessary to resolve the controversy as a matter of law, and it is shown that the movant is entitled to judgment, the entry of summary judgment is proper." *Lynx*, 273 Md. at 8, 327 A.2d at 509 (citing *Selected Risks Ins. Co. v. Willis*, 266 Md. 674, 296 A.2d 424 (1972); *S.L. Hammerman Organization, Inc. v. Community Health Facilities, Inc.*, 264 Md. 37, 50, 284 A.2d 599, 605 (1971)).

Nevertheless, regarding negligence actions, we have said that "[g]enerally, whether there is adequate proof of the required elements needed to succeed in a negligence action is a question of fact to be determined by the fact finder; but, the existence of a legal duty is [a] question of law to be decided by the court." *Muthukumarana v. Montgomery Co.*, 370 Md. 447, 472, 805 A.2d 372, 387 (2002) (quoting *Valentine v. On Target, Inc.*, 353 Md. 544, 549, 727 A.2d 947, 949 (1999)); *see also Bobo v. State*, 346 Md. 706, 716, 697 A.2d 1371, 1376 (1997) ("The existence of a duty is a matter of law to be determined by the court and, therefore, is an appropriate issue to be disposed of on motion for dismissal").

## V.

The case *sub judice* presents a matter of first impression in this Court. The essential question is whether, under the facts of this case, a hunter who organizes a hunting party may be held liable in negligence for injuries caused to others as a result of the negligent acts of another member of his or her hunting party. Remsburg Sr. argues that under Maryland law, no duty is imposed upon him to protect persons from the negligent acts of other hunters in his or her hunting party. Therefore, Remsburg Sr. contends that because he may not be held liable for the acts of Remsburg Jr., he was under no legal duty to protect the Montgomerys from injuries resulting from Remsburg Jr.'s negligence.

The Montgomerys counter that where a special relationship exists, a duty is owed not only to the parties involved in the relationship, but also to third parties. They argue that Remsburg Sr.'s status as father of Remsburg Jr. and "organizer" of the hunting party, as well as his encouragement of his son to hunt in a manner dangerous to others, provide the necessary elements to support a determination that a "special relationship" existed between Remsburg Sr. and his son whereby Remsburg Sr. was obligated to control his son's conduct. In the alternative, Respondents argue that a special relationship existed between Remsburg Sr. and the Montgomerys by virtue of a history of contractual and other relations between

the parties, and also Maryland statutes regulating hunting practices.

We have said that for a plaintiff to state a prima facie claim in negligence, he or she must allege facts demonstrating "(1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty." *Muthukumarana v. Montgomery Co.*, 370 Md. 447, 486, 805 A.2d 372, 395 (2002) (quoting *Valentine*, 353 Md. at 549, 727 A.2d at 949)(*citations omitted*). As first established in Maryland nearly a century ago:

> there can be no negligence where there is no duty that is due; for negligence is the breach of some duty that one person owes to another. It is consequently relative and can have no existence apart from some duty expressly or impliedly imposed. In every instance before negligence can be predicated of a given act, back of the act must be sought and found a duty to the individual complaining, the observance of which duty would have averted or avoided the injury.... As the duty owed varies with circumstances and with the relation to each other of the individuals concerned, so the alleged negligence varies, and the act complained of never amounts to negligence in law or in fact; if there has been no breach of duty.

*Bobo v. State*, 346 Md. 706, 714, 697 A.2d 1371, 1375 (1997) (quoting *West Virginia Cent. & P.R. v. State ex rel. Fuller*, 96 Md. 652, 666, 54 A. 669, 671–72 (1903)). Thus, our analysis of a negligence cause of action usually begins with the question of whether a legally cognizable duty existed.

When assessing whether a tort duty may exist, we often look to the definition in *Prosser and Keeton on Torts* § 53 (W. Keeton 5th ed.1984), which characterizes "duty" as "an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another." *See Muthukumarana*, 370 Md. at 486, 805 A.2d at

395 (*quoting Ashburn v. Anne Arundel Co.*, 306 Md. 617, 627, 510 A.2d 1078, 1083 (1986)). In determining the existence of a duty, we consider, among other things:

> the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered the injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost and prevalence of insurance for the risk involved.

*Ashburn,* 306 Md. at 627, 510 A.2d at 1083 (quoting *Tarasoff v. Regents of University of California,* 17 Cal.3d 425, 434, 131 Cal.Rptr. 14, 22, 551 P.2d 334, 342 (1976)). While foreseeability is often considered among the most important of these factors, its existence alone does not suffice to establish a duty under Maryland law. As we further clarified in *Ashburn:*

> [t]he fact that a result may be foreseeable does not itself impose a duty in negligence terms. This principle is apparent in the acceptance by most jurisdictions and by this Court of the general rule that there is no duty to control a third person's conduct so as to prevent personal harm to another, unless a "special relationship" exists either between the actor and the third person or between the actor and the person injured.

306 Md. at 628, 510 A.2d at 1083 (*citations omitted* ); *see also Scott v. Watson,* 278 Md. 160, 166, 359 A.2d 548, 552 (1976)("a private person is under no special duty to protect another from criminal acts by a third person, in the absence of statutes, or of a special relationship"). As noted, *supra,* the Montgomerys allege that such special relationships exist in the case *sub judice* sufficient to allow liability to attach to Remsburg Sr. for the negligent acts of Remsburg Jr.

In *Bobo v. State,* 346 Md. 706, 697 A.2d 1371 (1997), we held that such a "special duty" to protect another from the acts of a third party may be established "(1) by statute or rule; (2) by contractual or other private relationship; or (3) indirect-

ly or impliedly by virtue of the relationship between the tortfeasor and a third party." 346 Md. at 715, 697 A.2d at 1376 (*internal citations omitted*). We address in turn these three possibilities with regard to the existence of such a relationship between the Montgomerys and Remsburg Sr., or between Remsburg Sr. and Remsburg Jr., which could place Remsburg Sr. under a duty to protect the Montgomerys from the negligent acts of Remsburg Jr.

### A.

We first examine whether Maryland statutes or regulations regarding hunting create a duty in tort upon Remsburg Sr. to protect the Montgomerys. Evidence of negligence may be established by the breach of a statutory duty "when the plaintiff is a member of the class of persons the statute was designed to protect and the injury was of the type the statute was designed to prevent." *Erie Ins. Co. v. Chops*, 322 Md. 79, 84, 585 A.2d 232, 234 (1991) (*citing Pahanish v. Western Trails, Inc.*, 69 Md.App. 342, 362, 517 A.2d 1122 (1986)); *see also Geo. Byers Sons, Inc. v. East Europe Import Export, Inc.*, 463 F.Supp. 135, 138 (D.Md. 1979)("To use a statutory duty as a foundation for a negligence claim, the plaintiff must show that it was within the class of persons the legislation was intended to protect and that the alleged injury was of the type of harm which the statute was intended to prevent"). Furthermore, the statute must "set forth mandatory acts clearly for the protection of a *particular class* of persons rather than the public as a whole." *Ashburn*, 306 Md. at 635, 510 A.2d at 1087 (quoting *Morgan v. District of Columbia*, 468 A.2d 1306, 1314 (D.C.1983))(*citations omitted*).

In support of their contentions that Maryland statutory or regulatory law creates a duty upon Remsburg Sr. to protect the Montgomerys as landowners, the Montgomerys allude sweepingly to "Md.Code, Nat. Res. Art., § 10–301 et. seq. and the Code of Maryland Regulations (COMAR), 08.03, et. seq." [8]

---

8. Respondents, in their Brief (at 14 and 17), refer apparently to the entirety of Subtitle 3 (Hunting Licenses) of Title 10 (Wildlife) of the

After an exhaustive review of these sources in their entireties, we find no support for the Montgomerys' argument. The statutes and regulations alluded to by the Montgomerys address many things, such as the procedures for the issuance of hunting licenses and the number and type of wildlife and game that may be hunted, the definition of open seasons, and protecting endangered species. Absent from these statutes and regulations is any specific mention of a duty placed upon a leader of a hunting party, by virtue of his or her position as such, to protect all other hunters or landowners from the negligent acts of members of his or her hunting party. Of these "authorities," the only one with arguable relevance to

---

Natural Resources Article of the Md.Code, as well as Title 8 (Department of Natural Resources), Subtitle 3 (Wildlife), Chapters 10 (General Wildlife Hunting Regulations), 11 (Reptile and Amphibian Possession and Permits), and 12 (Wildlife Rehabilitations) of COMAR. Yet, nowhere in their Brief do they identify any particular section or subsection within these "authorities" as supporting their argument. Rather, Respondents elsewhere cite specifically only § 10–411 of the Natural Resources Article of the Md.Code, a provision in a succeeding Subtitle ((4)(Hunting Restrictions—in general)) to the one to which they otherwise refer. They cite § 10–411, however, not in support of their argument as to a statutory basis for a tort duty, but only in passing in the course of their argument as to why a material factual dispute exists. (Br. at 8).

Had our review of these "authorities" not yielded the substantive answer that patently none support Respondents' contentions, we would be inclined to invoke the principle that the failure to present with particularity one's arguments, or to cite and supply the verbatim text of all pertinent statutes and regulations, is deemed a waiver of such arguments. Maryland Rules 8–504(a)(5), (7) and 8–504(c); see Health Serv. Cost Rev. v. Lutheran Hosp., 298 Md. 651, 664, 472 A.2d 55, 61 (1984) ("a question not presented or argued in an appellant's brief is waived or abandoned"); Logan v. Town of Somerset, 271 Md. 42, 47, 314 A.2d 436, 449–50 (1974) (an issue neither briefed nor argued before us is considered to have been abandoned by the appellants); Ricker v. Abrams, 263 Md. 509, 516, 283 A.2d 583, 587 (1971) (where a point is not raised in brief or argument before the court, "we must regard it as having been waived"). As recently articulated by the Court of Special Appeals, it is not the province of the appellate courts to "rummage in a dark cellar for coal that isn't there." Konover v. WHE, 142 Md.App. 476, 494, 790 A.2d 720, 730 (2002) (quoting Electronics Store v. Cellco, 127 Md.App. 385, 405, 732 A.2d 980, 990 (1999)("it is not this Court's responsibility to attempt to fashion coherent legal theories to support appellant's sweeping claims")).

the case *sub judice* is Md.Code, Nat. Res. Art. § 10–411, which regulates hunting on privately owned land. That provision states in relevant part that:

> [e]xcept as otherwise provided, a person may not come to hunt upon any pretense whatever on lands owned by another person without the permission of the landowner or the landowner's agent or lessee. Any person hunting on private property shall be liable for any damage he causes to the private property while hunting. The landowner is not liable for accidental injury or damage to the person, whether or not the landowner or the landowner's agent or lessee gave the permission to hunt.

Regarding deer hunting specifically, the statute provides that:

> [i]n Allegany, Anne Arundel, Baltimore, Carroll, Charles, Garrett, Frederick, Wicomico, Somerset, Howard, or Worcester counties, a person may not enter or trespass upon land owned by another person for the purpose of hunting deer on the land with gun, rifle, bow and arrow, or any other means without first securing the written permission of the landowner or the landowner's agent or lessee. Any person hunting deer on land owned by another person shall exhibit written permission upon the request of any Natural Resources police officer, any law enforcement officer, the landowner, or the landowner's agent or lessee. The Natural Resources police officer or any law enforcement officer shall arrest any person hunting without written permission upon the request of the landowner or the landowner's agent or lessee.

This statute, like the other provisions cited by the Montgomerys, does not serve to impose either an explicit or implicit duty upon Remsburg Sr. to protect the Montgomerys from the negligent acts of Remsburg Jr. Explicit in this statute is a duty placed upon hunters to gain written permission from landowners prior to hunting on privately owned land, and also a duty upon law enforcement officers, upon the request of the landowner or his or her representative, to arrest any person without such permission. While the statute is framed so as to

indicate a legislative desire to protect landowners, a class of persons which would include Charles Montgomery at least, the statute may not be read reasonably to create a tort duty upon Remsburg Sr. to protect the Montgomerys. The general provision of the statute is designed to protect landowners from liability for injuries to parties hunting on their land and also to place liability on those who damage private property. Notably, the assignment of liability ends there and the statute makes no mention of assigning liability for the negligence of third parties. Furthermore, the statutory provision concerning deer hunting guards only against trespass and does not extend the general protection of the statute in any way so as to place liability on a hunter for the negligence of another hunter. That provision speaks only to the liability of an individual hunter for his or her own failure to obtain the requisite written permission. As such, the Montgomerys' contention that this statute creates a duty in tort upon Remsburg Sr. fails under the second leg of the test described *supra,* in that the injury to the Montgomerys, not being an injury to property, was not an injury or damage of the type the statute intended to prevent. Remsburg Sr. was neither directly responsible for the personal injury to the Montgomerys, nor a hunter on the Montgomery property at the time of the accident. Remsburg Sr.'s alleged actions and inactions, therefore, were outside the scope of the statute. As the Court of Special Appeals correctly determined "these laws do require a hunter to control **his or her own conduct,** by conforming it to the established legal parameters for hunting; but we see nothing in them to broadly require all hunters to ensure that their hunting companions do the same." *Montgomery v. Remsburg,* 147 Md.App. 564, 598–99, 810 A.2d 14, 34 (2002) (emphasis in original).

## B.

We turn next to the question of whether a contractual relationship existed in the case *sub judice* that would place a special duty upon Remsburg Sr. It is undisputed that no contract existed between Remsburg Sr. and Remsburg Jr.

The Montgomerys repeatedly deny that any contractual agreement existed between Remsburg Sr. and Charles Montgomery that would include the land where the accident occurred. Assuming the truth of all well-plead factual averments in the Montgomerys' complaint and drawing reasonable inferences in their favor, the Montgomerys allege at most that a contractual relationship previously existed between James Montgomery, Charles's father, and Remsburg Sr. The Montgomerys contend, however, that a special duty should be placed upon Remsburg Sr. arising out of the ten years of "business relations" between the parties, including previous and present lease agreements concerning nearby property.

In support of their contention, the Montgomerys look to *Griesi v. Atlantic General Hospital Corp.*, 360 Md. 1, 756 A.2d 548 (2000). The facts of and legal analysis employed in that case are inapposite to the case *sub judice*. In *Griesi*, we examined whether Griesi, a jobseeker, had a valid claim of negligent misrepresentation resulting in economic loss where he rejected other offers of employment based upon affirmative statements made to him during pre-employment negotiations with the hospital, a prospective employer. We examined whether the requisite intimate nexus existed between the parties such that a negligent misrepresentation claim could be maintained. In this regard, we observed that "Maryland law has found the equivalent of contractual privity in special relationships consummated during the course of pre-contract negotiations." 360 Md. at 12, 756 A.2d at 554. We found that evidence of extensive and detailed communications between the parties was sufficient for a jury to find that the hospital "failed to exercise reasonable care" in its communication of information to Griesi, that the hospital's chief executive officer responsible for making the statements knew or should have known that they would be relied upon to Griesi's detriment, and that Griesi in fact relied on those statements of information and was injured as a result when the hospital denied him employment after he refused alternative offers of employment.

The case *sub judice* does not involve an examination of the relationship between the parties in order to determine the

viability of a negligent misrepresentation cause of action. None of the parties here were engaged in any sort of pre-contractual negotiations, nor was there any evidence of reliance by the Montgomerys upon any affirmative statements of Remsburg Sr. Rather, the Montgomerys contend that there was no communication between the parties regarding the 1998 shotgun deer hunting season. Furthermore, the injury in *Griesi* involved economic loss which could be linked directly to the extensive negotiations between the parties. The personal injuries in the instant case could not be attributed directly to any present contractual or pre-contractual relations between Remsburg Sr. and the Montgomerys. As our determination regarding the existence of a "special relationship" in *Griesi* was based upon the entirely different theory of recovery of negligent misrepresentation, that decision offers no succor for the Montgomerys' argument in the case *sub judice*.[9]

## C.

Finally, we examine whether, on the alleged material facts, a special duty was created between Remsburg Sr. and the Montgomerys by virtue of the implied or indirect relationship between Remsburg Sr. and Remsburg Jr. or, alternatively, between Remsburg Sr. and the Montgomerys. Our review of the relevant case law reveals that the creation of a "special duty" by virtue of a "special relationship" between the parties can be established by either (1) the inherent nature of the relationship between the parties; or (2) by one party undertaking to protect or assist the other party, and thus often

---

**9.** The Montgomerys also cite the Court of Special Appeals decision in *Giant Food, Inc. v. Ice King, Inc.* 74 Md.App. 183, 536 A.2d 1182 (1988), which we similarly find factually inapposite and inapplicable to our analysis in the case *sub judice*. In that case, the Court of Special Appeals found sufficient evidence to support appellant's negligent misrepresentation claim, in the absence of a contract, because a special relationship had been created between the parties by virtue of seven months of contractual negotiations, during which time Giant knew or should have known that its employees' assurances were being relied upon by appellant, and such reliance would result, and did result, in substantial economic loss for the appellant.

inducing reliance upon the conduct of the acting party. We conclude that the Montgomerys did not establish a triable issue as to the existence of a special relationship by either of these methods.

### 1.

In *Lamb v. Hopkins*, 303 Md. 236, 492 A.2d 1297 (1985), we discussed in detail the inherent nature of the relationship between parties which could give rise to liability for the actions of a third party. In *Lamb*, we found that the *Restatement (Second) of Torts* was applicable to analysis of negligence liability for third party actions. Regarding the Restatement, we observed that:

> [s]ection 315 is a special application of the general rule set forth in § 314. Section 314 states that "[t]he fact that the actor realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose upon him a duty to take such action." In turn, § 315 articulates the general rule that:
>
> [t]here is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless
>
> > (a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or
> >
> > (b) a special relation exists between the actor and the other which gives to the other a right to protection.

303 Md. at 242, 492 A.2d at 1300. In reviewing our history of both citation and reference to § 315, we found that our decision in *Scott v. Watson*, 278 Md. 160, 359 A.2d 548 (1976), "suggests that § 315, which reflects the common law of this State, outlines the appropriate analytical framework for determining whether an actor has a duty to control a third person." *Lamb*, 303 Md. at 245, 492 A.2d at 1302.

We continued by examining in further detail the class of special relationships giving rise to a duty to control a third person's conduct based on the *relationship between the third*

*person and the actor.* We found such relations were described in Restatement §§ 316–19, specifically:

> [s]ection 316 provides that a parent has a duty to control the conduct of his minor child; § 317 establishes a master's duty to control the conduct of his servant; § 318 sets forth the duty of a possessor of land or chattels to control the conduct of a licensee; and § 319 deals with the duty of those in charge of persons having dangerous propensities.

*Lamb,* 303 Md. at 243, 492 A.2d at 1300–01; *see also Hartford Ins. Co. v. Manor Inn of Bethesda, Inc.,* 335 Md. 135, 150, 642 A.2d 219, 226 (1994) ("[a]lthough section 315 of the Restatement states the general rule, section 319 addresses a particular exception to that general rule"). We expressly adopted as Maryland common law § 319, which provides: "[o]ne who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm." *Lamb,* 303 Md. at 243, 492 A.2d at 1301. Delineating the boundaries of § 319, we stated that:

> [t]he operative words of this section, such as "takes charge" and "control," are obviously vague, and the Restatement makes no formal attempt to define them. The comment to §§ 319, however, indicates that the rule stated in that section applies to two situations. First, §§ 319 applies to those situations where the actor has charge of one or more of a class of persons to whom the tendency to act injuriously is normal. Second, §§ 319 applies to those situations where the actor has charge of a third person who does not belong to such a class but who has a peculiar tendency so to act of which the actor from personal experience or otherwise knows or should know.

> Illustrations appended to §§ 319, which concern the negligent release of an infectious patient from a private hospital for contagious diseases and the escape of a homicidal maniac patient through the negligence of guards employed by a private sanitarium for the insane, provide further guidance regarding the scope of §§ 319. Because there are degrees

of being "in charge" and having "control," these illustrations are obviously not by way of limitation. *See McIntosh v. Milano,* 168 N.J.Super. 466, 483 n. 11, 403 A.2d 500, 508–09 n. 11 (1979). These illustrations suggest, however, that §§ 319 has peculiar application to *custodial situations.* See Prosser and Keeton, supra, §§ 56 & n. 16, at 383 (indicating that the relationships discussed in §§ 319 "are custodial by nature").

303 Md. at 243–44, 492 A.2d at 1301 (*emphasis added* ).

The Montgomerys have not alleged any evidence which would establish sufficiently that any of the above relationships existed between Remsburg Sr. (the actor) and Remsburg Jr. (the third person). Section 316 does not apply as Remsburg Jr. was an emancipated adult, not a minor child, and thus Remsburg Sr. was under no duty to control his son's behavior. Section 319 is also inapplicable for a number of reasons. The Montgomerys allege that Remsburg Sr. should have known that his son would have the tendency to act injuriously. This contention, however, is unsubstantiated. They point to no evidence in the record even suggesting that Remsburg Sr. knew or should have known of such. It is undisputed that Remsburg Jr. was an experienced hunter who had been on over 550 previous hunting trips. Remsburg Jr. had been hunting numerous times before with his father, and the Montgomerys have not alleged any evidentiary facts that Remsburg Jr. ever acted negligently at any time prior to the day of the accident in question here.

The Montgomerys further allege that Remsburg Sr.'s comment after the accident, "I guess that rules out telling Jamie [Remsburg Jr.] to shoot at the first thing that moves," evidenced his knowledge of Remsburg Jr.'s tendency to act injuriously. While inappropriate at best, this comment may not be viewed reasonably in context as an indication of any knowledge as to Remsburg Jr.'s tendencies. Had Remsburg Sr. commented that Remsburg Jr. "always shoots the first thing that moves" or such other similar admissions, it would more likely support an inference of prior knowledge on the part of Remsburg Sr.

Even if such knowledge were shown, however, the relationship between Remsburg Jr. and Remsburg Sr. still would fail to establish a "special relationship" within the sweep of § 319 because the Montgomerys did not allege sufficiently that Remsburg Sr. was "in charge" of Remsburg Jr. As we noted in *Lamb*, § 319 has distinctive application to custodial situations. We do not find that Remsburg Sr.'s status as the "leader" of a hunting party creates a *custodial* relationship between himself and the members of his party. We decline to find such a broad relationship under these circumstances.

A special relationship nonetheless may be found to exist under the second class of relations described by the Restatement, *relations between the actor and the third party* that create a duty upon the actor to protect another from the third party. These relations are described in §§ 314 A and 320 of the Restatement. *Lamb*, 303 Md. at 243, 492 A.2d at 1301, n. 5. We have adopted previously as Maryland common law § 314A of the Restatement, entitled "Special Relations Giving Rise to a Duty to Aid or Protect," which provides that:

(1) [a] common carrier is under a duty to its passengers to take reasonable action

    (a) to protect them against unreasonable risk of physical harm....

(2) An innkeeper is under a similar duty to his guests.

(3) A possessor of land who holds it open to the public is under a similar duty to members of the public who enter in response to his invitation.

(4) One who is required by law to take or who voluntarily takes the custody of another under circumstance such as to deprive the other of his normal opportunities for protection is under a similar duty to the other.

RESTATEMENT (SECOND) OF TORTS § 314A (1965) [10]; *see Southland Corp. v. Griffith*, 332 Md. 704, 719, 633 A.2d 84, 91 (1993).

---

**10.** Section 320 of the Restatement creates a duty upon those "having custody of another to control the conduct of third persons" such as to prevent harm to the person in custody. It is clearly inapplicable to the

While this list was not intended to provide an exhaustive or inclusive description of the relationships between two parties such that it might give rise to a duty, a review of our previous cases reveals that the type of relationships where we have found such a duty require an element of dependence not present in the case *sub judice.* *See, e.g., Todd v. MTA,* 373 Md. 149, 165, 816 A.2d 930, 939 (2003) (finding that an employee of a common carrier has a legal duty to take affirmative action for the aid or protection of a passenger under attack by another passenger); *Southland,* 332 Md. at 720, 633 A.2d at 91 (finding that a convenience store, through its employee and by virtue of special relationship between the business and its customers, owed a legal duty to a customer being assaulted in store parking lot to call the police for assistance when requested to do so). While we have permitted some flexibility in defining this limited exception, such as including the employer-to-employee relationship and also that of the business owner-to-patron, we have been careful not to expand this class of "special relationships" in such a manner as to impose broad liability for every group outing.

In the case *sub judice,* there is no relationship of dependance between Remsburg Sr. and the Montgomerys sufficient to establish a duty to protect. The fact that Remsburg Sr. had a history of interactions with the Montgomery family regarding hunting rights and work arrangements does not make Charles or Brian Montgomery dependent upon Remsburg Sr. for protection against the negligent acts of third parties. The Montgomerys, as the landowners, had complete control of their property and chose to hunt upon it. The Montgomerys contend that they lacked even the knowledge that the Remsburgs intended to hunt on the property that morning. Thus, there clearly was no dependence upon Remsburg Sr. to protect the Montgomerys from the negligent acts of other hunters. Remsburg Sr.'s presence on the neighbor-

___

case *sub judice* as Remsburg Sr. was not in custody of Charles or Brian Montgomery.

ing Payne property did not affect the Montgomerys' control of their property.

### 2.

We also have found that a "special relationship" may be created in limited circumstances by virtue of a party's actions. In determining whether a "special relationship" between the parties has been created as a result of one party's actions, we have declined to adopt a formulaic test, preferring instead to review each case in light of the general standard formulated in *Ashburn. Muthukumarana*, 370 Md. at 495, 805 A.2d at 401. In *Ashburn*, the plaintiff filed suit against a law enforcement officer who failed to prevent an allegedly drunk driver from continuing to operate his vehicle which ultimately collided with plaintiff. 306 Md. at 619–20, 510 A.2d at 1079. The officer allegedly encountered John Millham in the driver's seat of his pickup truck outside of a convenience store. Noticing his intoxicated condition, the officer instructed Millham to park his truck and discontinue driving for the rest of the evening; however, after the officer left, Millham drove the truck out of the parking lot and subsequently hit and injured a pedestrian, Ashburn.

After first recognizing the general rule that an officer's duty to protect is a public duty, and "absent a 'special relationship' between police and the victim, liability for failure to protect an individual citizen against injury caused by another citizen does not lie against police officers," we went on to examine whether the actions of the police officer or Maryland statute created a "special duty." 306 Md. at 628, 510 A.2d at 1083. We explained:

> This "special duty rule," as it has been termed by the courts, is nothing more than a modified application of the principle that although generally there is no duty in negligence terms to act for the benefit of any particular person, when one does indeed act for the benefit of another, he must act in a reasonable manner.

*Ashburn,* 306 Md. at 631, 510 A.2d at 1085 (citing *Scott v. Watson, supra,* 278 Md. at 170–71, 359 A.2d at 555; *Pennsylvania R. Co. v. Yingling,* 148 Md. 169, 129 A. 36 (1925)). Thus, we stated that in order for a special relationship to be created between the officer and Ashburn, "it must be shown that the local government or the police officer affirmatively acted to protect the specific victim or a specific group of individuals like the victim, thereby inducing the victim's specific reliance upon the police protection." *Id.* (*citations omitted*). We found that the officer's act of approaching the intoxicated individual in his truck and instructing him to discontinue driving was insufficient to establish an affirmative act specifically for Ashburn's benefit or to induce his reliance upon the officer; thus, no special relationship existed.

In *Muthukumarana,* 370 Md. 447, 805 A.2d 372 (2002), we recently applied the *Ashburn* standard in our evaluation of two consolidated negligence claims against emergency telephone system operators. In the first of the consolidated cases, a communications officer with the Harford County Sheriff's Office received a call reporting a female laying semiconscious in the woods behind the K Court buildings in the Harford Square residential development. Upon dispatching the information to police officers on patrol, the communications officer erroneously reported that the female was lying to the rear of J Court, instead of K Court. The two responding police officers searched the areas behind the J Court and J1 Court townhomes, but did not locate the female. Later that night, the unconscious female died from hypothermia at the location behind K Court. The decedent's mother, Ms. Fried, filed suit against the communications officer and her supervisors, arguing that they owed a duty of care to the decedent "based on the fact that the [decedent] was an individual and a member of the class of persons who are the subjects of 911 or emergency calls, ... and injury to her from failing to give correct location information was readily foreseeable," 370 Md. at 462, 805 A.2d at 381 (*quoting Fried v. Archer,* 139 Md.App. 229, 243, 775 A.2d 430, 438, *cert. granted,* 366 Md. 246, 783 A.2d 221 (2001)).

In the second of the consolidated cases, the appellee, a 911 operator at the Montgomery County Emergency Communication Center, received a distress call from appellant, Ms. Muthukumarana, reporting that her husband was trying to kill her. At that time, the emergency operator dispatched the police, but continued to talk to Ms. Muthukumarana in an attempt to gain information from her, including her name, the address and nature of the emergency, the name and location of the attacker, and whether any weapons were in the home. During this telephone conversation, which lasted approximately one minute and forty seconds, the husband, armed with a gun, entered the room and shot his two children, who were huddled with their mother, and then shot himself. Both children and Mr. Muthukumarana died as a result of these wounds.

Appellant, Ms. Muthukumarana, filed a wrongful death and survival action for her two children against the emergency dispatch operator. Appellant argued that the emergency operator "negligently and carelessly failed to discharge her responsibilities," by failing to advise her to leave the premises in a timely manner. She further maintained that even if the emergency operator typically was protected by a qualified immunity, a "special relationship" existed between Ms. Muthukumarana and the operator by virtue of certain affirmative actions taken by the operator upon which Ms. Muthukumarana relied to her detriment. Thus, a special duty arose. In addition, Ms. Muthukumarana maintained that a "special relationship" was created between herself and the 911 operator because Montgomery County government previously acted to send her, as a victim of prior domestic violence, a pamphlet instructing her to call 911 in the event of a future attack.

After consolidation of the cases on appeal, the question before this Court was whether the lower courts erred in *Fried* and *Muthukumarana* "in applying the special relationship test to 911 employees, specifically to operators, dispatchers, and managers, and in subsequently determining that the employees in questions had no special relationship with or special

duty owed to the individual victims." 370 Md. at 471, 805 A.2d at 386. We concluded that they had not erred.

Initially, we determined that emergency assistance operators enjoy a qualified immunity under the public duty doctrine and, absent a "special relationship" with a caller, held that no such special relationship was established in either case. We stated:

> Under [the *Ashburn*] test, in order for a special relationship between a 911 employee and a person in need of assistance to exist, it must be shown that the 911 employee affirmatively acted to protect or assist the specific individual, or a specific group of individuals like the individual, in need of assistance, thereby often inducing the specific reliance of the individual on the employee. *See Ashburn*, 306 Md. at 631, 510 A.2d at 1085. Absent the existence of those factors, a special relationship may not be found to exist between the employee and the individual, and a 911 employee may not be held liable in tort to an individual.

370 Md. at 496, 805 A.2d at 401.

Applying the *Ashburn* analysis to the facts of the *Fried* case, we found no evidence that the emergency operator handled the telephone call at issue any differently than other calls received; thus, there was no action taken by the operator sufficient to impose a special duty in tort upon her. Furthermore, with regard to the emergency operator's supervisor, we found that no evidence was provided "of any action taken by [the supervisor] in this case in excess of or substantially different than his actions towards other individuals in need of 911 assistance." 370 Md. at 500, 805 A.2d at 404. As such, we found it unnecessary to determine the applicability of the second prong of the special relationship test.

In the *Muthukumarana* case, we held that the emergency operator was not negligent because the undisputed facts indicated that she had not deviated from the proper protocol for dealing with emergency telephone calls. Additionally, we stated that, even if the 911 operator had been deemed negligent, Ms. Muthukumarana could not prevail because the un-

disputed facts did not support a conclusion favorable to her under the first prong of the special relationship test. We emphasized that the mere receipt of the call did not in itself create a special duty between the 911 officer and the victims, nor did the operator take any action to protect or assist the victims directly which would result in the creation of a special relationship. Finally, we concluded that the receipt of the instructional pamphlet also did not create a special duty, as it served only as a reminder of the services available to the general public through the emergency telephone system.

We conclude that Remsburg Sr. did not owe a duty to the Montgomerys to protect them from the negligent acts of Remsburg Jr. While our previous cases examining the existence of a "special relationship" created by a party's actions or inactions involve public officials for the most part, we extract from them the general principle that we examine whether such a relationship exists on a case-by-case basis, looking especially for the existence of conduct by one party that ordinarily induces reliance by the injured party upon the acting party. In the case *sub judice,* we find no conduct by Remsburg Sr. to protect the Montgomerys, or a class of persons including them, which induced their reliance upon him. Remsburg Sr.'s previous relations with the Montgomerys concerning hunting on their property did not constitute an act to protect the Montgomerys under the facts of this case. Furthermore, nothing in the record to which our attention has been directed by the Montgomerys supports the allegation that Remsburg Sr. told Remsburg Jr. to take a position in the tree stand on the Montgomery property. Regardless, even such an instruction, had it been given, would not constitute conduct taken for the protection of the Montgomerys sufficient to induce their reliance.

The Montgomerys finally argue that the nature of hunting makes it inherently dangerous and, as such, a heightened duty must be attached to those who undertake it. Maryland precedent does not support such a heightened duty under the circumstances present in this case. It is the inherent

danger of the instruments used in the hunt which makes hunting any more inherently dangerous than a wide variety of other recreational activities and sports. In *Valentine v. On Target, Inc.*, 353 Md. 544, 727 A.2d 947 (1999), we addressed the inherent danger of guns, and declined to assign a heightened duty to gun dealers to protect all persons that may be harmed by guns sold by or stolen from the dealers. Similarly, placing a duty upon the "leader" of a hunting party to protect other persons from the negligent acts of all members of the hunting party, by virtue of the inherent danger in hunting and the potential use (or mis-use) of guns alone, would impose liability upon far too broad a class of persons. *See Valentine*, 353 Md. at 553, 727 A.2d at 951 (no special relationship between gun retailer and victim of shooting crime perpetrated with weapon stolen from retailer, because "[t]he class of persons to whom a duty would be owed under these bare facts would encompass an indeterminate class of people, known and unknown").

## VI.

Finally, it is worthwhile to mention briefly that the only other state court seemingly confronted with a comparable situation to that presented in the present case reached a conclusion similar to that reached here. In *Kramschuster v. Shawn E.*, 211 Wis.2d 699, 565 N.W.2d 581 (Wis.Ct.App.1997), the Court of Appeals of Wisconsin granted summary judgment to the leader of a hunting party, finding he was not liable for the death of the plaintiff's husband, who was shot and killed as a result of the negligence of a minor who was a member of the hunting party.[11] In that case, a 15–year old, Shawn E., was

---

11. While not as factually or legally analogous to the case *sub judice* as the situation confronting the *Kramschuster* Court, other State courts presented with questions of liability for the actions of other hunters also have reached similar conclusions to that reached here. *See, e.g., Johnson v. Johnson*, 410 Pa.Super. 631, 642, 644, 600 A.2d 965, 970, 971–72 (1991) (rejecting argument that the inherently dangerous nature of hunting imposes a duty upon each hunter to protect others and also finding no special relationship existed, under the Restatement (Second)

invited to join a hunting party consisting of Mr. McClelland and his 12–year old son. In anticipation of the start of deer-hunting season, the party stayed at a cabin located on land owned by McClelland. The following morning, the party proceeded to adjacent land, not owned by McClelland, and McClelland instructed Shawn where to position himself and also in which general direction he should shoot in order to drive any potentially injured deer toward the other members of the party. Before sunrise, and prior to the legal inception of the deer hunting season, Shawn fired his gun at what he thought to be a group of deer, but was in fact a group of other hunters walking on a nearby path. Allen Kramschuster was struck and killed as a result of this negligent action.

The *Kramschuster* court first observed that although Shawn was a minor, he had completed hunting safety courses and was familiar with hunting safety regulations. Using this knowledge, he had made an independent determination as to where and when to fire his weapon. 211 Wis.2d at 707, 565 N.W.2d at 584. While McClelland had failed to instruct Shawn regarding the presence of the path and the initiation of the hunting season, the court concluded that "failure to reiterate basic hunting rules to an independent member of the hunting party

of Torts § 315, between non-paternal members of a hunting party and another member's minor son who accidentally shot and killed another club member); *Ermert v. Hartford Ins. Co.*, 559 So.2d 467, 472 (La. 1990) (where one member of hunting group accidentally shot another member, remaining members were not primarily responsible because shooter was a coequal member of the group and was not the charge of any other member, was not known to act carelessly, and none of the other members encouraged or assisted the shooter's negligent act of loading the shotgun inside of the camphouse while moving toward the door); *Holliday v. Bannister*, 741 P.2d 89, 95 (Wyo.1987) (no master-servant relationship present which would impute negligence to father for 25 year-old son's accidental shooting of another hunter, where father and son were on hunting trip together); *Hall v. Booth*, 423 So.2d 184 (Ala.1982) (where structured, but unincorporated, hunt club existed and one member allegedly told another member that no other hunters would be present in the area, none of the members were liable for the negligence of the allegedly misled club member, who subsequently shot and killed another hunter, because the shooting was unforeseeable and the misleading information was not the proximate cause of the hunter's death).

does not create a foreseeably unreasonable risk of injury to another person under these facts." 211 Wis.2d at 707, 565 N.W.2d at 585. The *Kramschuster* court then rejected the allegation that McClelland had a duty to supervise Shawn as a member of his hunting party, finding that McClelland "accepted no responsibility of supervision by merely inviting ... Shawn to join them in the hunt." 211 Wis.2d at 707–08, 565 N.W.2d at 585. Lastly, the court found no evidence that McClelland actively mislead Shawn into firing before the start of the hunting season or induced the erroneous belief that no other hunters would be present in the area. The court observed that:

> [t]he record does not show that McClelland ever told Shawn that there would be no other humans in the area. Even if McClelland had made such a statement, Shawn had seen other people in the area and was aware that the trail could be utilized by other hunters. Therefore, Shawn could not have reasonably relied on any statement that no humans would be in the area.
>
> The evidence also does not support any suggestion that McClelland communicated to Shawn a time to start shooting. Shawn had independently, although incorrectly, concluded what time the hunting season began in his area and admittedly shot before the start of the season, as he believed it to be. Therefore, there is no evidence that McClelland actively induced Shawn to fire before it was safe.

211 Wis.2d at 708–09, 565 N.W.2d at 585.

Like Shawn, Remsburg Jr. was an experienced hunter who was familiar with the land on which he was hunting. Remsburg Jr. made an independent determination as to the appropriate time and direction to fire his weapon. The record in the case *sub judice* shows no evidence that Remsburg Sr. acted to induce Remsburg Jr. into believing that there would be no other persons hunting on the property, or that he should fire his gun at any time prior to the legal inception of the deer hunting season. Maryland law, like Wisconsin law, does not support the creation of a duty to supervise or control the actions of another experienced hunter merely by inviting that

person to join a hunting party. Moreover, unlike Shawn, a minor, Remsburg Jr. was a fully emancipated adult.

## VII.

For the above reasons, we conclude that Remsburg Sr., as a matter of law, was not liable for the injuries to the Montgomerys arising out of Remsburg Jr.'s negligent conduct. Remsburg Sr. was under no duty to the Montgomerys to control the acts of Remsburg Jr. or to protect them from the acts of Remsburg Jr. Without a duty there can be no actionable negligence and, as such, the trial court's grant of summary judgment in favor of Remsburg Sr. was proper.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH DIRECTIONS TO AFFIRM THE JUDGMENT OF THE CIRCUIT COURT FOR FREDERICK COUNTY; COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENTS.**

Chief Judge BELL concurs in the result only.

Dissenting opinion by WILNER, J.

With respect, I dissent. I agree with the Court that, as a general rule, a person who organizes a hunting party is not liable in negligence for injuries caused solely by the negligence of another member of the party. I agree that Remsburg, Sr. was not in "control" of his adult son, Remsburg, Jr., although there is no evidence that the son would not have obeyed a reasonable directive of the father. Finally, I agree that neither § 10–411 of the Natural Resources Article nor any other statute cited by the Montgomerys provides direct liability for personal injury to the Montgomerys on the part of Remsburg, Sr. for the negligent conduct of his son.

I do believe, however, that a limited duty does exist under § 10–411 from which liability on Remsburg, Sr.'s part could be found in this case. The conduct at issue here occurred in

Frederick County, making applicable § 10–411(b) and (c). Section 10–411(b)(1) provides:

"A person may not upon any pretense come to hunt on the lands owned by another person without the written permission of the landowner or the landowner's agent or lessee. Any person hunting on this private property is liable for any damage the person causes to the private property while hunting on the private property. The landowner may not be liable for accidental injury or damage to the person whether or not the landowner or the landowner's agent gave permission to hunt on the private property."

Section 10–411(c) deals specifically with deer hunting and contains a similar provision. In certain counties, including Frederick County, a person "may not enter or trespass upon land owned by another person for the purpose of hunting deer on the land ... without first securing the written permission of the landowner or the landowner's agent or lessee."

The Court correctly construes the second sentence of § 10–411(b)(1) as applying only to damage to the property, not to personal injuries, and it correctly construes the third sentence as dealing with the liability of the landowner, not the hunter. It dismisses § 10–411(c) and the first sentence of § 10–411(b)(1) as merely statutory trespass provisions, from which no liability for personal injury can flow. That is where I disagree. These *are* trespass provisions, of course, but they have a purpose beyond merely prohibiting a trespass. A statute is not necessary to preclude trespass. The common law has done that quite well for hundreds of years. These statutes are not in the Real Property Article of the Code. They are in a subtitle of the Natural Resources Article dealing solely with restrictions on hunting, which, because of the very nature of the activity, is exceedingly dangerous, often more dangerous to other persons in the area than to the animals being hunted.

What is the purpose of requiring written permission from a landowner before a stranger can enter his/her land to hunt? The Court seems to infer that the only purpose is to create

some documentary evidence that permission has been granted. That inference may be permissible with respect to § 10–411(c), which requires the hunter to exhibit the written permission on demand of a game warden, but there is no basis for such an inference under § 10–411(b)(1). Both statutes, I believe, but particularly § 10–411(b), have a broader purpose, and that is to make sure that landowners are aware that hunters will be on their land, so that they can take the proper precautions. The Legislature may well have had in mind the prospect of landowners, or their children, walking innocently across fields or through woods on their own property, unaware that hunters have entered on to the property, and being shot. Those statutes are safety measures, not just property laws.

It is undisputed that Remsburg, Sr. was, in fact, the leader and organizer of the hunt. There was clear, competent, admissible evidence that he did not have written permission from Charles Montgomery to hunt on his land and that he knew, or should have known, that no other member of his hunting party, including his negligent son, had such permission. Although he, himself, was not on Montgomery's land when the errant shot was fired, he knew that his son was on that land, perhaps at his direction and certainly with his acquiescence. Whether or not, as leader of the hunt, he had any duty to ascertain the whereabouts of the other members of the party, it seems to me that he at least had the duty to make sure that a member of the party whom he *knew* was illegally trespassing, whom he knew or should have known may thereby be endangering other people, and whom he presumably could cause to move, relocated to a lawful place.

Although a violation of § 10–411 may not, of itself, create liability for negligent conduct by another person, it does impose a duty on the organizer of hunts (and really on each hunter) to obtain written permission from the landowner. Because the purpose of that requirement—or at least a principal purpose of that requirement—is to protect the safety of the landowner and his/her family and guests, I believe that a violation of that duty can create liability for foreseeable harm arising from the violation. On this record, there was enough

evidence to make summary judgment improper. The real question was whether the harm that resulted was proximately caused by the failure to advise Montgomery of the intended invasion of his property, and, on this record, that was a jury issue.